Randy I. GIVAN and Charles Givan, Plaintiffs-Appellants,

v.

MACK TRUCK, INC., Defendant-Respondent.

No. 38597.

Missouri Court of Appeals, St. Louis District, Division Four.

May 23, 1978.

Motion for Rehearing and/or Transfer Denied July 14,. 1978.

Application to Transfer Denied Sept. 12, 1978.

John L. Oliver, Jr., Oliver, Oliver & Jones, P.C., Cape Girardeau, for plaintiffs-appellants.

Limbaugh, Limbaugh & Russell, Rebecca Cook, Joseph J. Russell, Cape Girardeau, for defendant-respondent.

DOWD, Presiding Judge.

A warranty case.

■ Plaintiffs Charles and Randy Givan brought suit to recover damages for breach of warranty regarding a truck which had been manufactured by defendant.[1] The trial court, sitting without a jury, found for the defendant and plaintiffs appeal.

The facts: On or about September 27, 1972 Charles Givan purchased a 1972 Mack Truck from Harris Truck and Tractor Sales of Cape Girardeau. He bought it for the purpose of leasing it to Sam Tanksley Trucking Company. He and his son Randy had made an agreement whereby the title to the truck would be in Charles Givan's name and Charles Givan would make the down payment. Randy Givan was to pay the balance due, drive the truck for Sam Tanksley Trucking Company, maintain the truck, and would receive a salary from his father for his efforts. The evidence showed that Charles Givan paid $3500 as a down payment. The unpaid balance, including cost of collision insurance and finance charge, was $36,476.16 to be paid in 48 monthly payments of $759.92. Randy made the first monthly payment on November 17, 1972. No further payments were ever made, although Randy Givan continued to operate the truck and his father received monthly notices of nonpayment.

Randy Givan was plagued with numerous problems with this truck. Some of these malfunctions happened only once, like the failure of the heater, (he had to go 100 miles in snowstorm without a defroster), the windshield cracked, the exhaust tube needed replacing, the truck cab leaked water, the oil pressure gauge needed repair, two wheels fell off while he was driving, oil leaked out of the engine around valve covers, and once 21 quarts of oil leaked out. Twice the stack brace broke. The throttle arm broke about four times. There were several problems with the overheating, but the problems were finally repaired in May, 1973. Other problems were recurring and were never properly repaired even after many efforts by authorized Mack Truck dealers around the country. These included loss of engine power, difficulty with the clutch and transmission (which made it difficult to change gears after coming to a stop), problems with steering, and with the air conditioner.

The evidence showed that the Mack truck dealers willingly serviced the truck whenever Randy Givan brought it in with a problem. Most of the work was done without charge under the Mack truck warranty.

In total there were about 30 different occasions that something went wrong with the truck in the nine months that Randy Givan possessed it, and it was in repair shops for 107 days. Sixty of these days were attributed to the incident when the wheels fell off.

Randy Givan remained in possession of the truck until June 9, 1973 when the turbocharger burned up in Laramie, Wyoming and the engine stopped running. The odometer read 51,500 miles at this time.[2] Harris Truck and Trailer was notified and they retrieved the truck. It was towed back to Cape Girardeau and repaired. At the time of trial it was still in possession of Harris Truck and Trailer Sales. The attorneys filed a stipulation with this court following oral argument that the truck had been sold and all claims for deficiency against plaintiffs had been released.

■ In this court-tried case, we must affirm unless the judgment below is not supported by substantial evidence, unless it is against the weight of the evidence or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30[1] (Mo. banc 1976).

Mack Truck's express warranty limits its liability to repair and replacement of defective parts. Mack Truck entitled this warranty "Standard Vehicle Warranty." It reads:

"The Manufacturer warrants each new Mack motor vehicle sold by it or by any of its authorized distributors to be free from defects in material and workmanship under normal use and service, its

---

1. While the main theory of plaintiffs' petition is breach of implied warranty, there was substantial evidence as to the express warranty. Thus the petition is deemed amended. Rule 55.33(b).

2. There were 2,189 miles on the truck when it was purchased.

obligations under this warranty being limited to repairing or replacing, as hereinafter provided, at its option any part or parts of said vehicle found to the Manufacturer's satisfaction to be defective upon examination by it, . . ."

The disclaimer provision of its express warranty states in bold print:

"THIS WARRANTY IS MADE EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND OF ANY OTHER OBLIGATION OR LIABILITY ON THE PART OF THE MANUFACTURER."

Our statutes and case law grant the right to limit remedies to repair and replacement of parts. § 400.2–719(1)(a); *Russo v. Hilltop Lincoln-Mercury, Inc.,* 479 S.W.2d 211, 213[4] (Mo.App.1972). However, "where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter." § 400.2–719(2). In this case, there were recurring problems with the steering, the engine losing power, the transmission, and the air conditioner, which were never satisfactorily repaired. The steering difficulty was present the first day the Givans took delivery of the truck. The steering problem was described by Randy Givan as follows: "You couldn't depend upon making a turn with the steering. If you started into a turn, you could turn the wheel and it wouldn't respond, it would turn but the wheels themselves didn't want to respond, and then it would all of a sudden come around." He took it in for repair about seven times, but it was never fixed. The problem with the transmission was described by Randy Givan as follows: "you just couldn't shift the truck. Sometimes it would hang in reverse and you just couldn't hardly get it out, and other times in fourth and fifth; it was very hard to shift." There were also problems with the clutch

which made it difficult to shift gears. This shifting difficulty was described by Randy Givan as: "you could put the clutch in and try to get it in gear, and if you didn't just go ahead and ram it in gear, sometimes you just couldn't get it into gear." On about five occasions he put the truck in a shop to get the problem remedied. A third constant difficulty plaguing the operation of the truck was loss of engine power. The problem was worked on about nine times. At one point, in San Jose, California, the engine lost its power, and the accelerator linkage was sticking. The Mack truck dealer in San Jose refused to repair it under the warranty. Randy Givan continued driving by pulling up the accelerator with the side of his foot. Apparently the problem was never completely remedied. Other recurring problems included problems with the engine overheating. More than once it overboiled, and Randy Givan would stop, let it cool, refill it with antifreeze and find the nearest Mack dealer. According to Randy Givan: "they would check it and say nothing was wrong." It was worked on six times before it was finally corrected in May in Boise, Idaho. He paid $90.69 for installation of new thermostats there, but after ten miles it overheated again, so he returned to the Boise Mack truck dealer and had metal shavings flushed out of the radiator. This second procedure cost Randy Givan $55.75, which was 45% of the total bill.[3] Another recurring problem was malfunction of the air conditioner, which "kicked out"; on one occasion it also leaked freon, and was recharged, but not repaired, which cost Randy Givan $15.18. It was worked on about six times but never satisfactorily repaired. Randy Givan made a list of these recurring problems and gave a copy to the Mack truck dealer in Cincinnati and another copy to Harris Truck and Tractor Sales. Since he lived in Cincinnati, he preferred to have warranty work done there when possible to save motel expenses.

For the most part, Randy Givan maintained the truck himself. He greased it and

3. Mack's standard vehicle warranty had a warranty schedule which warranted various parts for various time periods. The radiator schedule provided that Mack would pay 100% parts and labor for the first 12,000 miles within 1 year, and from 12,000–100,000 miles, the buyer's cost of repair was prorated on unused miles, up to 100,000 miles in 1 year.

changed the oil and tightened nuts and bolts periodically.

 When a manufacturer limits its obligation to repair and replacement of defective parts, and repeatedly fails to correct the defect as promised within a reasonable time, it is liable for the breach of that promise as a breach of warranty.[4] Thus, the fact that the manufacturer in good faith attempts to repair the defect whenever requested to do so is not a fulfillment of the warranty; he must demonstrate that the defect is permanently remedied as promised in the express warranty.[5] He can be liable for failure to fulfill the warranty obligation even if his failure to repair is neither wilful nor negligent. *Soo Line R. Co. v. Fruehauf Corp.,* 547 F.2d 1365, 1371, n. 7[6] (8th Cir. 1977); *Beal v. General Motors Corp.,* 354 F.Supp. 423, 427, n. 2 (D.Del.1973). Furthermore, the buyer is not bound to permit the warrantor to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty.[6] The limited, exclusive remedy fails of its purpose and is thus avoided under § 400.2–719(2) whenever the warrantor fails to correct the defect within a reasonable period; and when this occurs, all contractual remedies are available to the buyer.[7]

 We hold that Mack truck breached its express warranty by failing to repair within a reasonable time the recurring problems in the steering, the transmission, the loss of engine power, the air conditioning, and by "tinkering" so long before finally repairing the overheating. Since this is so, the limitation of remedy has failed of its essential purpose and all other contractual remedies are available. The most commonly applied formula for damages is stated in § 400.2–714(2) which gives the buyer "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if

4. See, e. g., *Matthews v. Ford Motor Co.,* 479 F.2d 399[3] (4th Cir. 1973); *Courtesy Ford Sales, Inc. v. Farrior,* 53 Ala.App. 94, 298 So.2d 26, 33 (1974); *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 148[4] (banc 1965); *John Deere Industrial Equipment Co., Inc. v. Ponder,* 135 Ga.App. 688, 218 S.E.2d 686, 687[2] (1975); *Jacobs v. Metro Chrysler-Plymouth, Inc.,* 125 Ga.App. 462, 188 S.E.2d 250[3] (1972); *Ford Motor Co. v. Gunn,* 123 Ga.App. 550, 181 S.E.2d 694, 696[1] (1971); *Allen v. Brown,* 181 Kan. 301, 310 P.2d 923[4] (1957); *Cox Motor Car Co. v. Castle,* 402 S.W.2d 429, 431 (Ky.App.1966). See generally 77 C.J.S. *Sales* § 340.

5. See, e. g., *John Deere Industrial Equipment Co. v. Ponder,* 135 Ga.App. 688, 218 S.E.2d 686 (1975); *Beech Aircraft Corp. v. Flexible Tubing Corp.,* 270 F.Supp. 548, 564[31] (D.Conn.1967); *Schroeder v. Fageol Motors, Inc.,* 12 Wash. App. 161, 528 P.2d 992, 995 (1974).

6. See, e. g., 77 C.J.S. *Sales* § 340; *Tiger Motor Co. v. McMurtry,* 284 Ala. 283, 224 So.2d 638, 644[9] (1969); *General Motors Corp. v. Earnest,* 279 Ala. 299, 184 So.2d 811, 814[3] (1966); *Jorgensen v. Pressnall,* 274 Or. 285, 545 P.2d 1382, 1385[6] (1976); *Cannon v. Pulliam Motor Co.,* 230 S.C. 131, 94 S.E.2d 397, 400[4] (1956); *Schroeder v. Fageol Motors, Inc.,* 12 Wash. App. 161, 528 P.2d 992, 995[4] (1974).

7. The official comment to § 400–2.719(2) explains: ". . . it is of the very essence of a sales contract that at least minimum adequate remedies be available. . . . [U]nder sub- section (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this article." Many other jurisdictions have found similar repair/replace remedy limitations in warranties to fail of their essential purpose when the defect is never repaired. See, e. g., *Soo Line R. Co. v. Fruehauf Corp.,* 547 F.2d 1365, 1370[3] (8th Cir. 1977); *Riley v. Ford Motor Co.,* 442 F.2d 670, 673 (5th Cir. 1971); *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.,* 428 F.Supp. 364, 381–82[29] (E.D.Mich.1977); *Walker Truck Con., Inc. v. Crane Carrier Co.,* 405 F.Supp. 911, 919 (E.D. Tenn.1975); *Beal v. General Motors Corp.,* 354 F.Supp. 423, 426[2] (D.Del.1973); *Jones & McKnight Corp. v. Birdsboro Corp.,* 320 F.Supp. 39, 43–44 (N.D.Ill.1970); *Earl M. Jorgensen Co. v. Mack Construction Inc.,* 56 Haw. 466, 540 P.2d 978, 986[16, 17] (1975); *Adams v. J.I. Case Co.,* 125 Ill.App.2d 388, 261 N.E.2d 1, 7–8 (1970); *Bosway Tube & Steel v. McKay Machine Co.,* 65 Mich.App. 426, 237 N.W.2d 488, 490[2] (1975); *Eckstein v. Cummins,* 321 Ohio App.2d 1, 321 N.E.2d 897, 904[5] (1974); *Ehlers v. Chrysler Motor Corp.,* 226 N.W.2d 157, 161[7, 8] (S.D.1975); *Moore v. Howard Pontiac-American, Inc.,* 492 S.W.2d 227, 229[1] (Tenn.App.1972). See generally 67 Am.Jur.2d *Sales* § 534, at 718–719; J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 12–10 at 382 (1972).

they had been as warranted . . . ." See, J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 10–2. Other remedies available include the buyer's incidental and consequential damages resulting from the breach, § 400.2–715. Incidental damages are costs "effecting" cover and any other reasonable expenses incident to the breach. § 400.2–715(1). Consequential damages are losses resulting from the buyer's general or particular requirements and needs of which the seller had reason to know at the time of contracting and which could not be prevented by cover. § 400.2–715(2). See *Kohlenberger Inc. v. Tyson's Foods, Inc.,* 510 S.W.2d 555, 560 (Ark.1974). The most commonly litigated and sought-after item of consequential damages is lost profits. J. White & R. Summers, supra, § 10–4 at 319.

When we examine the facts of this case in light of the stipulation filed by the attorneys, we find it difficult to award plaintiffs extensive damages. The "difference in values" measure of damages of § 400.2–714 is inappropriate where plaintiffs no longer have the truck and the balance due on it has been forgiven.[8] Plaintiffs did not present evidence of their consequential damages, as they are required to do. § 400.2–715, Comment 4. Although loss of profits may be an appropriate measure of consequential damages, Randy Givan was unable to state that there was work available for him during the time the truck was in the shop.[9] Although the Uniform Commercial Code "reject any doctrine that damages must be calculable with mathematical accuracy", § 400.1–106 official comment 1, there must be a substantial basis for awards of lost profits, and speculation is not permissible. *Coonis v. Rogers,* 429 S.W.2d 709, 714[2] (Mo.1968). It would be pure speculation for us to award lost profits based on the evidence introduced. Randy Givan also seeks $1,850 as his out-of-pocket damages incident to the breach. However, $1300 of this amount was spent when the wheels fell off the truck and the truck was two months in repair shops. Evidence was introduced showing that this wheel incident was due to Randy Givan's failure to keep the lug nuts on the wheels properly tightened, so this cost cannot be assessed against the manufacturer. This leaves $550 spent by Randy Givan. These expenses are itemized below.[10] Of these expenses, about $200.00 was proximately caused by the breach of express warranty occasioned by

8. Furthermore, even if such measure were appropriate, plaintiffs failed to present any evidence of the value of a new 1972 Mack truck with the uncured defects, as the trial judge noted in the judgment.

9. On direct examination he stated, "Well, I couldn't say exactly whether there was work available because when I have to call in to report that I have to go to the shop, then they take me out of service, so I can't truthfully say that there was definitely work available." He introduced evidence that he only made $16,-019.89 in the 9 months he drove the truck as compared to the average yearly earnings of $70,000 of drivers under similar type leases. However, we cannot assume he would have made $52,500 in that 9 months (¾ of $70,000) since cross examination showed that the $70,-000 figure varies greatly and depends upon many unknown factors. Furthermore, it appears the Givans have ultimately made money on the use of this truck. Testimony was elicited that the fair rental value of this truck was $150 a day. The Givans drove it nine months and paid only $4,259.92 (the down payment and one monthly payment). If they had rented it for that period of 252 days, (and not paid rent

for the 107 days the truck spent in the shop), it would still have cost them $21,750.00. We are not to overcompensate the Givans, but are only to put the Givans in as good a position as if there had been no breach of warranty, § 400.1–106.

10. Randy Givan listed his expenses as follows: $177.76 for a new windshield on December 18, 1972; $33.60 to replace the heater core on March 18, 1973; $5.50 to replace the stack brace on the same date; $27.42 to replace a wheel seal and left rear drive axle, on April 27, 1973; $15.18 to recharge the air conditioner in May of 1973; $90.69 to install new thermostats on May 17, 1973; $55.75 to have the radiator flushed out on the same date; and $23.69 to replace a rotted air line also in May of 1973. These total $429.82; apparently the other $120 he claims he spent was due to motel and sundry expenses; he spent 3 days in Omaha, Nebraska getting an oil leak repaired, he had to buy 21 quarts of oil there to replace what had leaked, and spent 3 days in Boise, Idaho when the radiator was being repaired.

Mack Truck's failure to repair certain recurring defects when they had the first opportunities to do so. The other expenses of about $350 were related to repairs of non recurring defects under the warranty schedule. The $200 damages sustained by plaintiffs included $15.18 for the air conditioner repair; and both the $90.69 and $55.75 for work done to repair the overheating problem, plus about $40.00 in hotel bills when the overheating was repaired in Boise, Idaho. We hold that plaintiff has been damaged in the amount of $200.00 since these expenses were all occasioned by Mack Truck's failure to repair these defects at no charge under the express warranty within a reasonable time. Although we have not ruled on whether Mack Truck failed to effectively disclaim its implied warranties of merchantability or fitness for a particular purpose, we do not feel that the remaining $350 spent by Randy Givan demonstrates that the truck was unmerchantable or unfit for the purpose for which it was bought.

Accordingly, the judgment is reversed on the issue of liability since the trial judge erred in failing to apply § 400.2–719(2) to these facts. *Murphy v. Carron,* supra. We hold that Mack Truck breached its express warranty by failure to remedy certain recurring defects, and plaintiffs are entitled to a judgment for $200 as a result of the breach of the warranty.

The judgment is reversed and the cause remanded with directions to enter judgment in accordance with this opinion.

SNYDER, J., and ALDEN A. STOCKARD, Special Judge, concur.