**OLDHAM'S FARM SAUSAGE CO., Respondent,**

v.

**SALCO, INC., Appellant.**

No. 31822.

Missouri Court of Appeals, Western District.

March 30, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied May 4, 1982.

Application to Transfer Denied June 14, 1982.

Laurence R. Tucker, W. Robert King, Kansas City, for appellant.

William E. Simmons, Kansas City, for respondent.

Before SOMERVILLE, C. J., Presiding, and TURNAGE and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

Plaintiff Oldham's Farm Sausage Co. brought suit to recover damages for breach of contract, breach of express and implied warranty, and strict liability regarding a defective "Salco Multi-Chiller" refrigeration system manufactured by defendant Salco, Inc. The trial court, sitting without a jury, found for plaintiff and defendant appeals.

On appeal, defendant asserts that the trial court erred for the following reasons: (1) the judgment failed to require plaintiff to elect its remedy among mutually inconsistent theories; (2) there was not a finding that the multi-chiller was "unreasonably" dangerous under § 402A Restatement (Second) of Torts; (3) the damages suffered were not recoverable under § 402A; (4) the express and implied warranties were effectively disclaimed in the contract; (5) the parties waived any breach of contract action by entering into a second agreement; (6) the recoverable damages were limited by the contract to repair or replacement of parts for one year and no consequential damages; and (7) the award of $214,167.45 exceeded the $200,000 plus interest and costs requested in the prayer.

The following facts may be adduced from the parties Stipulation and the trial court's Findings of Fact. Plaintiff is a Missouri corporation engaged in the business of butchering, processing, packing, selling and distributing pork sausage products. Defendant is a Missouri corporation engaged in the business of manufacturing, selling, supplying and installing machinery and equipment for meat, pork, beef and poultry

processing businesses. Defendant held a patent for its "Salco Multi-Chiller" and was apparently the only company in the United States which sold such a machine at the time of its sale to plaintiff.

In February, 1974, defendant submitted to plaintiff a 28 page "Proposal-Quotation-Order Confirmation" for the sale and installation of a "Salco Multi-Chiller" for the expressed purpose of providing a quick chilling for plaintiff's sausage products. The new machine was intended to reduce the time needed to refrigerate plaintiff's perishable product from about 24 hours to approximately 30 minutes, thus drastically reducing the possible bacteria life in the sausage and consequently increasing its "shelf-life."

The "Proposal" represented the machine to be fully automated with a chilling system "complete from loading to discharge." This proposed contract also contained a "Guarantee" directly above the space for signatures which stated that: "The equipment and operation which is listed and set forth in this Order Confirmation is guaranteed to perform as specified, with the final determination by the satisfaction of you, our customer—." The proposal also warranted that the multi-chiller would provide a rapid, thorough, quick chilling of plaintiff's products; that the design, construction and installation of the multi-chiller would be done in a workmanlike manner; and further detailed certain technical specifications as to the machine's performance once installed. The proposed sale price was $150,000.00, 90% paid on delivery and 10% "upon satisfactory operation of the equipment."

On March 2, 1974, plaintiff and defendant signed the contract and plaintiff paid the agreed upon $135,000.00. Plaintiff's president, Mr. Michael Gibson, testified that he read the entire agreement before signing it. However, on the back side of that same signature page was a half-page, 13 paragraph, very fine print section which contained self-entitled "terms and conditions cover[ing] apparatus manufactured by SALCO, INC." (Attached for reference as Appendix 1). Among the various paragraphs concerning "Wiring" and "Voltage, etc." was a "Standard Guarantee and Warranty" which stated in pertinent part that:

The Company will repair or replace, at its option, defects in material or workmanship developing within one year from date of shipment from the factory.

Another paragraph of these "terms" entitled "Limitation of Liability" stated that:

Except for the express warranty above set forth, the Company makes no warranty, express or implied, and makes no warranty of fitness for a particular use . . . . Under no circumstances shall the Company be liable for damage to good will, loss of profits or for any type of consequential damage.

Plaintiff was required to build a special room to house the multi-chiller and the machine became the sole method for the chilling of plaintiff's products. The multi-chiller was designed to carry plaintiff's sausage products (packaged in polyethylene) into the machine via carriers, the carriers moving through the machine powered by a conveyor belt. The sausage products would then be dumped into a propylene glycol chilling solution, which would freeze the products. The machine was designed to then wash and blow the glycol off the packages, completing the chilling process.

Soon after the machine was installed it failed to operate properly. The carriers often tilted and dumped the sausage products, breaking the packages and soaking the products in glycol, ruining the sausage and damaging the carriers and other parts of the machine. The automatic loading system never did work properly, which necessitated anywhere from one to five of plaintiff's employees to assist the loading and operation of the machine. Further, large amounts of the expensive glycol were lost, requiring the use of much greater amounts of the chilling solution than expected.

In November, 1974, the above problems and many others caused the multi-chiller, and consequently plaintiff's entire business, to be shut down for 7–10 days while major modifications were made by defendant. A checklist of the many problems was prepar-

ed by the parties and defendant then attempted to make these repairs. However, the problems continued to exist even after these changes, and neither party was satisfied with the operation of the machine.

In September, 1975, plaintiff's plant was again shut down for 9 days for further repairs and modifications. These repairs were made by two of defendant's former employees (apparently because defendant could not be reached). Although plaintiff's president testified the multi-chiller improved 100% from where it had been, the machine continued to constantly malfunction. The volume of products the machine could handle was lessened; glycol was still escaping the machine; one full-time employee was still needed to operate and assist the machine; the products were still being discharged from the machine with excessive amounts of glycol on them; the glycol was not being properly washed and blown off at the exit conveyor; and the conveyor belt was being cut in half by the conveyor chain. It is agreed by the parties that the machine cannot be further modified to be fully automatic and has since required one or more employees to operate.

The trial court concluded that: (1) defendant had breached the contract; (2) the express warranties mentioned earlier had all been breached; (3) the implied warranties of merchantability and fitness for its intended purpose were breached; and (4) the multi-chiller was "defective" and "dangerous." The court also found that plaintiff was unable to rescind its contract, that no alternative method of freezing its product was reasonably available, and that plaintiff had not failed to mitigate its damages. The parties stipulated to the specific amounts of damages in the event the court found defendant liable. The court detailed the many costs and damages incurred by plaintiff, totalling to $214,167.45.

■ In this court tried case, this court must affirm unless the judgment below is not supported by substantial evidence, unless it is against the weight of the evidence or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30

(Mo. banc 1976). Moreover, the judgment must be affirmed if it is sustainable on any theory set forth in the pleadings or supported by the evidence. *May Department Stores Co. v. County of St. Louis*, 607 S.W.2d 857, 869 (Mo.App.1980). In the instant case, the evidence supports the trial court's conclusions regarding the express warranties and the implied warranty of merchantability. The judgment is therefore affirmed.

## I.

■ Defendant contends the trial court erred in not requiring plaintiff to elect its remedy between the allegedly inconsistent theories of contract and tort. Defendant asserts that there is no authority for submitting a contract action in the same suit with a tort action, and states that there is a "long-established standard of making a plaintiff adopt one or the other in bringing a suit." Defendant cites no authority for those contentions and is mistaken in its belief that such is the rule.

Rule 55.10 states that "a party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds." *See also* Rule 55.06(a). The equitable rule of election of remedies is only applicable when the theories of recovery submitted are inconsistent with each other. *Timmons v. Bender*, 601 S.W.2d 688, 690 (Mo.App.1980); *Austin & Bass Builders, Inc. v. Lewis*, 350 S.W.2d 133, 140 (Mo.App. 1961). In the present case, the combination of express and implied warranty actions can not be said to be inconsistent theories of recovery. *See, e.g. O'Brien v. Wade*, 540 S.W.2d 603 (Mo.App.1976). Further, although our courts have attempted to restrict the resort to § 402A in areas usually reserved for contract, the damages here to "property other than the property sold" is sufficient evidence to support the submission of the strict liability in tort theory. *Crowder v. Vandendeale*, 564 S.W.2d 879, 881 (Mo. banc 1978); *Gibson v. Reliable Chevrolet, Inc.*, 608 S.W.2d 471 (Mo.App. 1980). Whereas, the theories of warranty

and strict liability in tort may be reserved for different situations, these theories are not always inconsistent so as to keep them from being submitted together when there is evidence to support both.

## II.

■ Defendant next asserts that the contract's express and implied warranties were effectively disclaimed by several provisions on the back side of the signature page. The particular page and provision therein, on which defendant relies to negate the multitudinous warranties in the 28 page contract, is reprinted as an appendix to this opinion. If ever there was an example of the expression "burying something in fine print," it is graphically illustrated here. Section 400.2-316, RSMo 1978,[1] allows for the exclusion or modification of warranties, subject however, to several conditions. First, in order to disclaim the implied warranty of merchantability the provision must be both "conspicuous" and mention the word "merchantability". § 400.2-316(2); *Groppel Co., Inc. v. U. S. Gypsum Co.*, 616 S.W.2d 49, 58-61 (Mo.App.1981). There was no mention of the term "merchantability" within the "Limitation of Liability" paragraph or anywhere within the fine print conditions and the exclusionary language was far from "conspicuous."[2]

Second, in considering the alleged limitation of the contract's express warranties, it should be noted that "[w]hen a manufacturer limits its obligation to repair and replacement of defective parts, and repeatedly fails to correct the defect as promised within a reasonable time, it is liable for the breach of that promise as a breach of warranty." *Givan v. Mack Truck, Inc.*, 569 S.W.2d 243, 247 (Mo.App.1978); § 400.2-719. In *Givan*, the proposed limitation of

warranty was on the front side of the contract and appeared to be the only such warranty made in the contract. The disclaimer provision in *Givan*, which stated that the repair or replacement was "in lieu of any other warranties, express or implied," was in bold print on the front side of the contract, the court still ruled the provisions inapplicable because of the defendant's repeated failures to remedy its defective product.

In comparison, the contract in the present case contains many express warranties in the body of the contract, including a "Guarantee" directly above the signature spaces. In stark contrast, the alleged limitation provisions, *i.e.* the "Standard Guarantee", and the "Limitation of Liability" (which purports to make that standard guarantee the sole guarantee in the contract) are set out in barely legible fine print on the back side of that signature page, buried amidst many other technical provisions. Even if this court were to give effect to the fine print limited warranty provision, which it is definitely not doing, the *Givan* case makes it clear that a repair and replacement limitation may be breached in circumstances far less onerous than those presented here. Regardless of the warranty limitations imposed, the *Givan* case makes it clear that "the buyer is not bound to permit the warrantor to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty." 569 S.W.2d at 247 (footnote omitted).

Finally, although Section 400.2-719(1)(a) provides that the parties may by agreement alter, substitute or limit the remedies available, subsection (2) conditions such limitations or modifications such that the exclusive remedy cannot "fail of its essential

---

1. All references are to RSMo 1978.

2. *See Dorman v. International Harvester Co.*, 46 Cal.App.3d 11, 120 Cal.Rptr. 516 (1975) (purpose of 2-316(2) is to prevent situations where the large print giveth and the fine print taketh away); *Massey-Ferguson, Inc. v. Utley*, 439 S.W.2d 57 (Ky.1969) (print not in larger or contrasting type or color and on back of page ruled not conspicuous); *Realmuto v. Straub*

*Motors, Inc.*, 65 N.J. 336, 322 A.2d 440 (1974) (language on back of contract not conspicuous); *Eckstein v. Cummins*, 41 Ohio App.2d 1, 321 N.E. 897 (1974) (fundamental purpose of disclosure provision to prevent surprise from unexpected and unbargained for disclaimers of express or implied warranties). *Cf. Estrin Construction Co., Inc. v. Aetna Cas. & Surety Co.*, 612 S.W.2d 413, 418-419 [4-6] (Mo.App.1981).

purpose." This last subsection is most often used "when the exclusive remedy involves replacement or repair of defective parts ... and the seller because of his negligence in repair or because the goods are beyond repair, is unable to put the goods in warranted condition." J. White and R. Summers, Handbook of Law Under the Uniform Commercial Code, p. 469 (2nd Ed. 1980). Such is the case here. *See Soo Line Railroad Co. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir. 1977); *Majors v. Kalo Laboratories, Inc.*, 407 F.Supp. 20 (M.D.Ala. 1975).

Defendant cites to *Chase Resorts, Inc. v. Johns-Manville Corp.*, 476 F.Supp. 633 (E.D. Mo.1979) as analogous to the case at bar. In *Chase Resorts*, however, the court found no breach of any implied warranties but held that the product sold was merchantable and fit for the ordinary purpose for which such goods were used. The court also ruled that certain language in the contract alleged to be implied warranties were effectively disclaimed by a warranty limitation in the contract, but the court did not expressly rule that the limitations would effectively disclaim the implied warranty of merchantability, as the court had already ruled there had been no breach of warranty. That case is distinguishable from the facts in the instant case and the general language there is inapposite.[3]

In conclusion, the trial court did not err in holding that defendant breached the express warranties in the contract as well as the implied warranty of merchantability.

**3.** The *Chase Resorts* case was disposed of for failure to bring the warranty action within the four-year statute of limitations.

**4.** The issue of novation was neither pleaded nor included in defendant's post trial motion. In any event, the alleged second contract was no more than a checklist, which included a myriad of continuing problems with the machine. The checklist was not signed by either party, and could in no way amount to a novation of the parties' contract. At best, this document is but a part of the protracted, indefinitely continuing "tinkering" with the machine—a needless ritual as per *Gavin, supra.*

**5.** In *Funding Systems Leasing Corp. v. King Louie International, Inc.*, 597 S.W.2d 624 (Mo. App.1979), this court distinguished between

Moreover, because the trial court's decision on those issues can be sustained by substantial evidence, there is no reason to consider the points of error concerning the strict liability claim or the alleged waiver of plaintiff's breach of contract claim.[4] The only issues remaining relate to the proper amount of damages.

### III.

■ Defendant next asserts that the language in the fine print "Limitation of Liability" which purports to exclude any recovery of consequential damages should have worked to deny the award of damages for the cost to plaintiff for the additional manhours required to operate the multi-chiller, the cost of plaintiff's sausage products destroyed by the malfunctioning machine, and other allegedly indirect and unforeseen damages.

Section 400.2–719(3) allows for the parties to exclude consequential damages *unless* that exclusion is "unconscionable." There is no definition of the term "unconscionable" and the Missouri law on this subsection is scant. The comments to that section say that the principle behind the concept of unconscionability is "the prevention of oppression and unfair surprise." Thus, although there is no mention of whether a limitation clause must be conspicuous, the fact that a clause is tucked away in fine print on the back side of the signature page may well lead to "unfair surprise" and therein be unconscionable.[5]

"substantive" and "procedural" unconscionability in discussing a disclaimer of warranty under § 400.2–302. The fact that a clause may be in fine print or hidden was termed a matter of "procedure." The court stated that in circumstances where there is a gross "procedural" unconscionability, much may not be needed by way of "substantive" unconscionability, *i.e.* undue harshness in the contract terms themselves. In *King Louie*, the court found little "substantive" unconscionability because all warranty rights had not been deprived the appellant, and found no "procedural" unconscionability because the disclaimer was prominent and conspicuous. Although the case did not concern § 400.2–719(3), the reasoning is analogous to this section's "unconscionability" provision and the facts in the case at bar are easily

Cross referenced also is § 400.2–316, which in paragraph 2 refers to a "conspicuous" written exclusion. Reference to the appendix is again suggested, for rereading of those provisions in light of the contract and the facts of this case.

Comment 1 to § 400.2–719 also states that "it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to include a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract."

Defendant would have this court exclude all damages but the $4,422.27 awarded for the replacement of the numerous damaged product carriers and related multi-chiller parts. The remaining damages represent replacement parts added and repairs made subsequent to the one year period of limitation, as well as other damages which could be deemed consequential (costs for additional labor, lost glycol, lost sausage products, and modifications to the refrigeration system). Such an award of damages can hardly be said to be a "minimum adequate remedy" for the myriad of losses and costs suffered by plaintiff from the constant and long-term malfunctioning of the multi-chiller. In light of all the circumstances surrounding this case, the consequential damages exclusionary clause here was unconscionable and will not be allowed.

## IV.

Defendant's last point is that the trial court erred in awarding damages of $214,167.45 when the prayer requested only $200,000.00. The cases cited by defendant state the general rule that the amount of relief granted is restricted to that for which is prayed. These decisions, however, involve situations where objection was made to the evidence of excess damages, where the trial court has miscomputed the award, where the evidence did not support the verdict, or where the case was tried by a jury and the award was the result of passion, bias or prejudice. Plaintiff cites to *Pike v. Pike*, 609 S.W.2d 397, 400 (Mo. banc 1980), for its holding that "[w]hen variance occurs *without objection* between pleading and proof, such variance, especially in court tried cases, shall be considered immaterial and the pleadings deemed amended to conform to the proof." (Emphasis added.) *See* Rule 55.33(b).

This court has held in accord with the reasoning in *Pike* on the specific issue of damages in *Arzberger v. Grant*, 500 S.W.2d 23 (Mo.App.1973). There, the court granted summary judgment for the plaintiff and awarded damages of $3,500 even though the prayer requested only $500. The plaintiff filed a motion to amend the petition "after judgment," which the trial court granted. This court affirmed, saying that "[t]he affidavit proof supported that judgment, and in such case the pleading will be *treated* as having been amended to conform to the proof at the time of the entry of judgment. It was really unnecessary to grant permission to amend the pleadings later on as was done." *Id.* at 27 (emphasis original).

In *Bowers v. Spinaio*, 421 S.W.2d 790, 793–795 (Mo.App.1967) and *Vitt v. Baer*, 335 S.W.2d 681, 685–686 (Mo.App.1960), trial court's verdicts were upheld which exceeded the prayer, even though there was no motion filed requesting leave to amend the petition to increase the prayer for damages. In *Vitt*, the court noted that the law prior to Rule 55.33 (as then codified in § 509.500, RSMo 1959) would not allow a judgment in excess of the prayer to stand without amendment to the petition, but said that the "rules of civil procedure were not as liberal as they are now." The court went on to emphasize that the rules now provide that "*failure to so amend does not affect the result of the trial of these issues,*" and allowed the award in excess of the prayer. 335 S.W.2d at 685 (emphasis original).

As these cases demonstrate, Rule 55.33(b) provides that a petition may be treated as amended if the defendant impliedly con-

distinguishable. *Cf.* 597 S.W.2d at 650–51

(Shangler, J. dissenting).

sents to that amendment by failing to object to the evidence when it is offered. These decisions allow damages to be awarded exceeding those in the prayer, at least in a court tried case when there is definite evidence supporting such a higher award and where the damages are easily ascertainable as they are here.[6]

In the present case, the parties stipulated to various items of damage (approximately $188,400) accumulated up through dates certain after the final modifications had been made on the multi-chiller. At trial, plaintiff's president testified, without objection, that certain of these problems continued to occur, such as an ongoing need to have at least one full time employee operate the machine and a continued loss of excessive amounts of glycol, after the date of the stipulation and up to the date of trial. The trial court took note of these continuing damages in its Findings of Fact, and awarded additional damages for these continuing losses by simply adding these amounts on to the damages stipulated to by the parties.

Because the trial court, as trier of fact, had ample evidence to support its award, and because defendant did not object to this evidence which clearly took the damages above the $200,000 figure pleaded, this court will not reverse that award. Defendant cannot fail to object to plaintiff's evidence of damages in excess of those it has previously conceded, and then claim surprise, prejudice or hardship. Although Rule 55.33(b) should be applied with care, it is certainly applicable to the facts of this case. The trial court has the power to grant "any relief consistent with the case made by the plaintiff and embraced within the issues," (Rule 74.11), and its award here did exactly that.[7]

6. See also Ethridge-Atkins Corp. v. Abraham, 160 So. 817 (La.App.1935); Foxworth-Galbraith Lumber Co. v. Southwestern Contracting Corp., 165 S.W.2d 221 (Tex.Civ.App.1942).

7. Missouri's Rule 74.11 is almost identical to Federal Rule 54(c), which has often been relied upon to allow awards of damages in excess of

TURNAGE, J., concurs.

SOMERVILLE, J., concurs in part and dissents in part in a separate opinion.

SOMERVILLE, Chief Judge, concurring in part and dissenting in part.

I concur in the majority opinion in all respects except as to the amount of damages awarded. With respect to the amount of damages awarded, I respectfully dissent for the following reasons.

Plaintiff prayed for damages against defendant in the sum and amount of $200,-000.00. The damages sought by plaintiff were unliquidated. The trial court entered judgment in favor of plaintiff and against defendant in the sum and amount of $214,-167.45, an amount which the majority opinion concedes exceeded plaintiff's prayer for relief.

The majority opinion purports to justify the $214,167.45 judgment rendered in favor of the plaintiff, even though exceeding the prayer for relief, on the ground that under Rule 55.33(b) the prayer for relief was amended by the evidence. It should be noted that plaintiff never requested leave of court to amend his prayer for relief.

I respectfully disagree that a prayer for relief in a suit for unliquidated damages is subject to being amended solely by the evidence under the auspices of Rule 55.33(b). Such a construction raises the specter of an amended prayer silently creeping into a case unbeknown to a defendant. The end result is that defendants in suits seeking unliquidated damages are put to their peril as to the limits of exposure which they are called to defend against and their only recourse would be to object to every item of evidence offered with respect to damages. The chaos and confusion necessarily injected during trial is self-evident.

the prayer in a court tried case. Duke v. Sun Oil Co., 320 F.2d 853 (5th Cir. 1963); Neff v. Western Cooperative Hatcheries, 241 F.2d 357 (10th Cir. 1957); Riggs, Ferris & Geer v. Lillibridge, 316 F.2d 60 (2nd Cir. 1963). See also Ford v. Gilbert, 397 S.W.2d 41 (Ky.1965).

It has long been an established principle that a judgment exceeding the prayer for relief in a suit seeking unliquidated damages cannot stand. *Madget v. Jenkins*, 461 S.W.2d 768, 775 (Mo.1970); *Fletcher v. North British and Mercantile Ins. Co.*, 425 S.W.2d 159, 164 (Mo. banc 1968); *Edmonds v. Stratton*, 457 S.W.2d 228, 234 (Mo.App. 1970); and *Zweifel v. Lee-Schermen Realty Co.*, 173 S.W.2d 690, 701 (Mo.App.1943). Emasculation of this principle under the authoritative guise of Rule 55.33(b) strains the intent and resiliency of said rule vis-a-vis the basic unfairness, chaos and confusion which would inexorably follow.

I would affirm the judgment of the trial court in all respects except as to the amount of damages awarded, but would remand the case to the trial court with directions to enter judgment for the plaintiff and against the defendant in the sum and amount of $200,000.00, in accordance with the prayer for relief.