**Gary L. HIBBS and Theresa Hibbs, Respondents-Appellants,**

v.

**JEEP CORPORATION, Appellant-Respondent.**

**No. WD 34191.**

Missouri Court of Appeals, Western District.

Jan. 3, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Feb. 28, 1984.

Application to Transfer Denied April 16, 1984.

---

C. David Whipple, David W. Whipple, Kansas City, for respondents-appellants.

George P. Coughlin and Sarah W. Hays, Kansas City, for appellant-respondent; Gage & Tucker, Kansas City, of counsel.

Before CLARK, P.J., and PRITCHARD and LOWENSTEIN, JJ.

PRITCHARD, Judge.

Plaintiffs submitted their case against the Jeep Corporation for breach of an express warranty given by it in connection with the sale of a 1979 Jeep Cherokee automobile. The jury returned a verdict on the express warranty count for $7,500, and also upon the submission of a charge of fraud in Count V in the amount of $12,500.

Plaintiffs candidly concede in their brief that the submission of the fraud claim was not supported by the evidence, notably that there was no evidence that the warranty was false, or that there was on Jeep's part a present fraudulent intent not to perform it at the time when it was given. Consequently, that part of the judgment must be set aside, and it is unnecessary to notice further Jeep's claim of error in its submission, except as to how it might bear on the breach of warranty claim.

Plaintiffs purchased the Cherokee on August 28, 1978, for a total of $9,210, trading in a 1975 Chevrolet for an allowance on the purchase price of $2,266.83. The balance was payable by promissory note secured by a security agreement given by Pete Franklin Chrysler, which note was assigned by it to the Bank of Independence. Plaintiffs paid a total of $3,854.67 on the note during its existence.

At the time of the purchase plaintiffs received a Jeep limited warranty covering the vehicle which provided that Jeep "* * * will pay for the repair or replacement of any part it supplies which proves defective in material or workmanship under normal use and service."

In November, 1978, plaintiffs took the Cherokee to Rodekopf Motors in Independence, Missouri, to have its wiring harness repaired, which was done under the warranty, Rodekopf stating that the harness had been pinched by the hood. Mr. Hibbs admitted that the wiring harness problem was not related to his present claim (for a fire caused by a defective transmission) and he was making no claim that the wiring harness was any part of his damages.

In the first week of December, 1978, there was a transmission fire in the vehicle while Mrs. Hibbs was operating it. The vehicle was towed to Rodekopf Motors which fully disassembled the transmission. J.C. Deihl, Jeep's district service manager, was then present and was asked to examine the transmission fluid. He observed that it was dark gray in color and had an odor like "raw sewage". He did not know what caused the unusual look and smell of the fluid, and gave no instructions to Rodekopf as to how to work on the transmis-

sion. It was reassembled and the repair cost was paid by Jeep under the warranty, and Mr. Hibbs obtained it on December 15, 1978, after being advised by Rodekopf that the transmission repair had been completed. On the way home he noticed that the transmission was making noise, throwing fluid out and that there was smoke coming from the engine compartment. He called Rodekopf and told them that "their brand new transmission didn't last", and he was advised that a tow truck would be sent on December 18 to rebuild the transmission. He told neither Rodekopf nor his wife, whom he subsequently called, that there was smoke coming from the engine compartment.

Mr. Hibbs then asked his daughter to move the vehicle and when she started it, the engine compartment burst into flames, which "burned clear on back under the Jeep." Mr. Hibbs called John T. Doudna, Jeep's owner relations manager, after the fire and told him that "his vehicle had quit pulling, was leaking fluid in his driveway and he wanted to know what I was going to do about it." The fire was not then mentioned. Doudna told him to contact the dealership and make arrangements to have the vehicle taken back so it could be looked at. On the Saturday following the fire, Jeep's Mr. Deihl found out about the incident, and discussed it with Doudna the next Monday, then discovering that there were varied stories about what had happened. Doudna asked Deihl to perform a fire examination of the vehicle at Rodekopf's. On that day Mr. Hibbs again called Doudna and asked what he was going to do about his fire because he wanted his insurance company, which he had notified, to know of the outcome.

On December 19, 1978, Deihl inspected the vehicle for about one and one-half hours, finding the dipstick in place with no evidence that transmission fluid had been expelled, and no combustible wiring or other materials were present in the area of the most significant damage on the vehicle. He asked Doudna to look at it to get a second opinion, which Doudna did for more than an hour. There transmission fluid was found to be normal and there was no evidence of combustion therein. He was convinced that the fire did not start around the transmission. The hottest point of the fire was on the driver's side, about a foot in front of the fire wall, where nothing combustible was located. If the fire had started on the passenger side as a result of the burping of the fluid, the heat would have destroyed the heater box, but it and the hoses were untouched. Doudna also observed that the upper radiator hose at the front of the engine was burned in two.

As a result of these examinations, Doudna and Deihl were unable to find any evidence of any mechanical or manufacturing defect that started the fire. Mr. Hibbs was so informed by Doudna, and it was suggested that he turn the matter over to his insurance company, which was declined. On February 23, 1979, plaintiffs' counsel notified Jeep that "* * * as of this date Mr. Gary Hibbs revokes the acceptance of said Cherokee Chief and demands the refund of the purchase price of the vehicle. Said automobile is now in the possession of the Rodekopf dealership." The demand was rejected on the basis that there was no evidence of any defect as the cause of the fire of December 15, 1978. The filing of this suit followed.

At trial plaintiffs produced two mechanics as expert witnesses. Each of them thoroughly examined the vehicle on several occasions, at which time the dipstick was two or three inches up out of the filler tube, thus creating an umbrella-like effect which forced the transmission fluid to back down upon the hot manifold as it comes out of the filler tube. Both witnesses noted that the rubber seal in the cap of the dipstick was not there. One of the witnesses, Mott, gave his opinion that the fire started at the right rear manifold by the dipstick filler tube and then spread across the back fire wall along the wiring and wiring harness. The fire started as a result of fluid "burping" out of the filler tube onto the manifold. A transmission in good working order does not permit fluid to come up out of the filler tube, and if it

does, there has to be a defect in the transmission, which in this case was a blocked air vent.

The other witness, Cooper, also identified the starting point of the fire as being at the top of the transmission by the filler pipe, which he found to be rusted as a result of the fire. His opinion was also that the fire started as a result of the transmission "burping" fluid. Both witnesses testified that the defect identified was consistent with Mr. Hibbs' testimony about the noise it was making and the way it was acting prior to the fire. A transmission with this kind of problem would have heat building up inside it, causing the fluid to foam and develop pressure. The heat could be so extreme that the fluid could catch fire within the transmission. With the transmission fluid being so hot and spraying onto the hot manifold, an engine fire is the natural result. Both witnesses found fluid oil on the right front part of the inner fender skirt, and a fireman, Zellmer, testified that he saw transmission fluid on the side of the transmissions.

■ Although the foregoing evidence of causation conflicted with that of Jeep, it was sufficient for the jury to find that a defect was present which gave rise to Jeep's duty to pay for repairs under its express limited warranty.

Upon the remaining Count I, against Jeep upon the theory of breach of the express warranty of repair or replacement of any part that fails due to a defect in material or workmanship under normal use and service, Jeep contends that it was error to include as an element of damages in Instruction No. 8 any consequential damages occasioned by the breach. Instruction No. 8 submitted:

"If you find in favor of plaintiffs, then you must award plaintiffs such sum as you believe was the difference between the fair market value of the 1979 Jeep Cherokee automobile when plaintiffs discovered or should have discovered it did not conform and its fair market value had it been as represented by defendants *plus such sum as you believe will fairly*

*and justly compensate plaintiffs for any other damage plaintiffs sustained as a direct result of the 1979 Jeep Cherokee automobile failing to conform.*

"The phrase 'fair market value' as used in this instruction means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and when bought by one willing or desirous to purchase it but who is not compelled to do so." [Italics added.] The source of the instruction is stated to be MAI 16.02 and 4.17, as offered by plaintiffs.

■ Without doubt, under the facts of this case, if there had been evidence to support them, plaintiffs would have been entitled to submit to the jury the issue of consequential damages. That is provided for in § 400.2–715(2)(a) and (b), RSMo 1978. There is, of course, a limitation of the repair warranty here in these words, "What the Warranty doesn't cover ... * * 'Loss of time, loss of use of the vehicle, inconvenience, consequential damage or other incidental expenses' ", which is a valid limitation or exclusion under § 400.2–719(3), unless it is unconscionable. That limitation, however, is not applicable to this case for the reason that the limitation of recovery or exclusion from recovery in the express warranty is referable *only* to the matter of repair of the vehicle if Jeep had chosen to perform that warranty. Jeep, however, has disclaimed any duty to repair upon its asserted ground given to plaintiffs that there was no defect in the Jeep Cherokee. Under that evidence, Jeep's warranty of repair of the vehicle failed, and plaintiffs would therefore be entitled to any other damages which their proof established. See the excellent article, "Failure of Essential Purpose and Essential Failure on Purpose: A Look at Section 2–719 of the Uniform Commercial Code", 31 Southwestern Law Journal 759, 768, quoting *Moore v. Howard Pontiac-American, Inc.*, 492 S.W.2d 227, 229 (Tenn.App.1972), " 'In this case, though given the opportunity to comply with its warranty, appellant either could not or would not make the necessary

repairs or parts replacement to give appellees that which they purchased—an automobile substantially free of material defects—thus freeing appellants (sic, appellees?) to seek other relief.' " See the further discussion of clauses excluding liability for consequential damages at pages 772, et seq., of that article, and these further cases and authority: *Volkswagen of America, Inc. v. Harrell*, 431 So.2d 156 (Ala. 1983); *Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71 (Minn.1981); *Goddard v. General Motors Corp.*, 60 Ohio St.2d 41, 396 N.E.2d 761 (1979); the discussion in *Earl M. Jorgensen Co. v. Mark Construction, Inc.*, 56 Hawaii 466, 540 P.2d 978, 986, et seq. (1975), and cases cited; Anno. 2 ALR 4th 576, 590, § 5[a]; and note especially § 400.2–719(2), "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter." See also in this connection, 58 Washington University Law Quarterly 317, "The Enforceability of Contractual Clauses Excluding Sellers from Liability for Consequential Damages under Section 2–719 of the Uniform Commercial Code."

▇▇▇ Regardless of any right to receive consequential damages under the rationale of the foregoing authorities, the giving of Instruction No. 8 was error because there was no evidence to support the submission of that element of damages. The argument to the jury by plaintiffs' counsel was this: "Now in regard to these damages, we have—the Hibbs, as you know, bought the vehicle for Ninety-Two Hundred Dollars. The salvage value was Two Thousand Sixty-One which leaves damages there of $7,129.00. In addition to that there was some sales tax of $229.29." These figures compute to $7,368.29, which is $131.71 short of the $7,500 verdict returned by the jury. There is no evidence at all of this $131.71, which plaintiffs say was $128.00 short and which they urge could be cured by this court by remittitur. But the sales or use tax is not a damage occasioned by Jeep's breach of its warranty to repair. Rather, it is a tax imposed by the state of Missouri for the purchase price paid, less

the allowance for a traded-in vehicle under Chapter 144, RSMo.1978. Perhaps in a proper case these items which were improperly included in the amount of the verdict could be deducted by way of remittitur, thus curing it. But there are other facts indicating confusion of the jury. There was a stipulation of facts, entered into by the parties, which in part included a fact that the Bank of Independence, after taking possession of the vehicle, sold it for salvage for $2,067, which it applied to plaintiffs' loan balance. Over plaintiffs' objection, the stipulation was not admitted into evidence except for the paragraph as to salvage sale, but counsel for plaintiffs read to the jury only the portion, "In January, 1981, the 1979 Cherokee Jeep was sold at salvage for a net amount of $2,067.00." The jury was never informed as to how the salvage money was disposed, and certainly it was confused as that subject for it sent to the court the question, "Can we find out who got the salvage money?" The court responded, "I cannot answer your question. I can only refer you to testimony and argument of counsel during trial." There is no way of knowing whether the jury did in fact take into consideration the salvage value in arriving at its verdict, and Jeep would be entitled to that deduction from the purchase price, which amount was obviously applied by the bank on plaintiffs' note balance to their benefit. Plaintiffs would be unjustly enriched at Jeep's expense if the jury did not in fact deduct the salvage value. There is also further confusion evident in the jury's consideration of damages. The record shows that it first returned verdict A (which was referable to the warranty instruction) for $20,000. The court rejected that verdict and sent the jury out to consider the verdicts anew. The jury then returned a new Verdict A crossing out the $20,000 figure and writing below it $7,500 and also returned a verdict for $12,500 actual damages on the fraud claim, with no punitive damages allowed. [The latter verdict is here conceded by plaintiffs to have been improper under the evidence.]

The confusion, however, does not end with what has above been noted. Although Jeep does not, by a point of error, complain of the measure of damages portion of Instruction No. 8, the "before and after values", under the facts here that measure was in error for the reason that plaintiffs no longer had possession of the vehicle and their obligation to the bank had been discharged in full by its sale for salvage and application of insurance proceeds. Although § 400.2–714(2) does provide, "The measure of damages for breach of warranty is the difference in value at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted", it provides further, "unless special circumstances show proximate damages of a different amount." It is said in *Givan v. Mack Truck, Inc.*, 569 S.W.2d 243, 248[8–13] (Mo.App.1978), "The 'difference in values' measure of damages of § 400.2–714 is inappropriate where plaintiffs no longer have the truck and the balance due on it has been forgiven." [This case is mentioned in the argument portion of Jeep's brief.] Here, in a similar situation, plaintiffs no longer had the Jeep Cherokee and the balance due on it at the bank had been paid in full from various sources. The matter of the proper measure of damages was further complicated by the testimony of Mrs. Hibbs, the co-owner of the vehicle. She told the jury that the purchase price of the automobile of around $9,200 on August 25, 1978 was its *then* reasonable market value. The transmission fire occurred on December 15, 1978. Then one of the mechanics who examined the vehicle some four months later testified that it then had a fair market value of from $1,800 to $2,000. The measure of damages should have been covered by MAI 4.01 rather than MAI 4.17, then plaintiffs could argue to the jury their right to recovery of the purchase price (less the amount of the salvage) which is a remedy provided by the Magnuson-Moss Act, 15 U.S.C. § 2301, et seq., which gives to consumers a right of civil action against a warrantor for breach of the warranty, which under 15 U.S.C. § 2310(d)(1)A, is cognizable in any court of competent jurisdiction in any state. Under 15 U.S.C. § 2304(a)(4), if the product contains a defect which is not remedied after a reasonable number of attempts, the warrantor must permit the consumer to elect a refund for the product. [In this case, Jeep was given the opportunity to remedy the transmission condition, but after inspection denied there was a defect, which the evidence here showed existed, thus giving rise to the alternative remedy of refund.] See also *Miller v. Andy Burger Motors, Inc.*, 370 S.W.2d 654, 660[6] (Mo.App.1963), a rescission case, similar to the revocation of acceptance and the demand for return of the purchase price here, where the court said, " * * * [B]ut, if the contract is rescinded, the purchaser's damages, if any, are determined from the original amount paid or purchase price. (Citing cases and authority.)"

By reason of the numerous errors, and the uncertainty as to how the jury reached its verdict, this case does not lend itself to the expediency of remittitur, but it should be remanded for new trial on the issue of damages alone, including definite evidence as to the disposition of the salvage sale proceeds.

Jeep contends that the evidence of payment by plaintiffs' insurer for the fire damage should have been admitted, as included in the stipulation of facts, $4,206.69, which was paid to and applied by the Bank of Independence to the loan balance of plaintiffs. Plaintiffs' objection to that part of the stipulation was that it was inadmissible because it was payment from a collateral source. Jeep argues that the collateral source doctrine is applicable only to claims against tortfeasors, and not to warranty-contract actions such as this. The trial court properly ruled out of evidence the insurance payment. The doctrine does not apply only to claims against tortfeasors. See *Wells v. Thomas W. Garland, Inc.*, 39 S.W.2d 409[7–8], 412 (Mo.App.1931), a contract bailment case holding that the bailee, claiming mitigation of dangers by reason of the bailor's insurance on a coat, was a

stranger to that contract, and the damages could not be mitigated to the extent of the insurance collected by the injured party. See also *Erhart v. Wabash Ry. Co.*, 118 S.W. 657, 659, 136 Mo.App. 617 (1909). The premium on the policy here was paid by plaintiffs, and the policy had a loss payable to their lender. Jeep was a stranger to that insurance contract, which was not made for its benefit. The trial court did not err in excluding that portion of the stipulation of facts.

Plaintiffs contend, by cross-appeal, that the trial court erred in denying them attorney fees under the Magnuson-Moss Act, 15 U.S.C. § 2310(d)(2). It is noted that Jeep had not established an informal dispute settlement procedure under 15 U.S.C. § 2310(a)(2), and therefore plaintiffs had to bring their suit for damages on the *written* warranty in the Circuit Court under 15 U.S.C. § 2310(d)(1). Paragraph (2) of this latter section provides, "If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on the actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate." Obviously, upon a consideration of the facts, the trial court had the discretion to deem the requested award of attorneys' fees as inappropriate. The parties join issue on whether the trial court abused its discretion in denying plaintiffs their requested attorneys' fees. Jeep cites cases defining "abuse of discretion". A frequent definition is: "An abuse of discretion is an erroneous finding and judgment which is clearly contrary to the facts or the logical deductions from the facts and circumstances before the court—a judicial act which is untenable and clearly against reason and which works an injustice." *State v. Stubenrouch*, 499 S.W.2d 824, 826[4–6] (Mo.App.1973). *Beckman v.*

*Beckman*, 545 S.W.2d 300, 301[1] (Mo.App. 1976); see also *Thummel v. Thummel*, 609 S.W.2d 175, 183[12, 13] (Mo.App.1980). There are state cases which have allowed attorneys' fees in actions for breach of warranty under the Magnuson-Moss Act, e.g., *Champion Ford Sales, Inc. v. Levine*, 433 A.2d 1218, 1227[9–10] (Md.App.1981) [where the court remanded the case for a determination of the amount of attorney fees to be awarded, unless the court determined the award to be inappropriate.]; *Nobility Homes, Inc. v. Ballentine*, 386 So.2d 727 (Ala.1980); *Welch v. Fitzgerald-Hicks Dodge, Inc.*, 121 N.H. 358, 430 A.2d 144 (1981); *Massingale v. Northwest Cortez, Inc.*, 27 Wash.App. 749, 620 P.2d 1009 (1980); and *Ventura v. Ford Motor Corporation*, 173 N.J.Super. 501, 414 A.2d 611 (1980), aff'd. 180 N.J.Super. 45, 433 A.2d 801 (1981) [overruled on other grounds, 88 N.J. 277, 440 A.2d 1345 (1982)]. At least one case holds that where a plaintiff was relieved of his obligation to pay a remaining portion of a purchase price as damages for breach of warranty of a jeep after revocation of its acceptance, there was no abuse of discretion in disallowing attorney fees claimed under 15 U.S.C. § 2310. *Trost v. Porreco Motors, Inc.*, 297 Pa.Super. 393, 443 A.2d 1179 (1981).

The plaintiffs' action in three counts, in their second amended petition, in addition to the Jeep Corporation, was brought against Pete Franklin Chrysler-Plymouth, Inc.; Galen Boyers Motors, Inc.; Bill Rodekopf AMC Jeep & Vans Corporation; Pete Franklin AMC Jeep, Inc.; and Bank of Independence. These additional defendants were dismissed at various stages, and the final submission on the grounds of breach of warranty and for fraud was against Jeep only. Plaintiffs' counsel tendered to the trial court an itemized list of subject matter and hours spent on the case, which counsel testified was taken from time records kept in his office. The list shows obviously that much of the time spent was on the claims against defendants other than Jeep. It does not show with any clarity what portion of the time was

spent on the case against Jeep, what lawyers (whether a lawyer, law clerk, or senior partner) worked on the case, and their specific charges made. The hours are totalled for attorneys: office, 400.40; trial 40.00; total, 440.40; law clerk hours, 168.50; additional attorney hours and law clerk hours since filing motion for attorney fees, 28.75 and 9.50 respectively. It was testified to by counsel that law clerk hours were charged at the rate of $35.00 per hour; preparation of pleadings, research and appearance on motions, $65.00 per hour; and for trial time, $85.00 an hour as a minimum amount. The total amount of attorney fees requested was $37,524.75, which was denied by the court. There was also requested a total of $1,754.94 for the expenses incurred by plaintiffs, which was not ruled by the court. Plaintiffs' counsel had advised them that his attorneys' fees would be in a reasonable amount.

■ Plaintiffs contend further that the trial court erred in not giving reasons as to why an award of attorneys' fees would be inappropriate in this case, i.e. the "special circumstances" which would render the award unjust. No request for findings of facts and conclusions of law were made to the court on this issue and therefore the trial court cannot be convicted of error in denying attorney fees without giving reasons. Rule 73.01; *Walker v. Walker*, 631 S.W.2d 68 (Mo.App.1982); *Watkins v. Johnson*, 606 S.W.2d 493 (Mo.App.1980).

■ Under all of the circumstances, this court cannot find any abuse of discretion, under the above definition thereof, in the trial court's denial of attorney fees, and plaintiffs' request for a remand for determination thereof is overruled.

Other questions raised by Jeep do not relate to the issue of damages, and need not, therefore, be considered.

The judgment of $12,500 on the fraud count is reversed. The judgment of $7,500 on the warranty count is reversed, and the case is remanded thereon for new trial on the issue of damages only, including a consideration of plaintiffs' claim for expenses, other than attorney fees, incurred as they may under the evidence be referable in nature and amount to the claim of plaintiffs against The Jeep Corporation alone.

All concur.