**RHODEN INVESTMENT COMPANY, INC.,
Plaintiff-Respondent-Appellant,**

v.

**SEARS, ROEBUCK AND COMPANY,
Defendant-Appellant-
Respondent.**

**Nos. 56762, 56883.**

Supreme Court of Missouri,
Division No. 1.

Sept. 10, 1973.

Motion for Rehearing or to Transfer to
Court en Banc Denied Oct. 8, 1973.

Donald W. Giffin, F. Lee Major, III, Kansas City, for appellant Rhoden Investment Company, Inc.; Spencer, Fane, Britt & Browne, Kansas City, of counsel.

Karl F. Schmidt, Larrie C. Hindman, Kansas City, for defendant Sears, Roebuck & Company; Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, of counsel.

HIGGINS, Commissioner.

Action by Rhoden Investment Company, Inc., for declaratory judgment and rent in which plaintiff was awarded judgment against defendant in sum $13,829.66 representing rentals due plaintiff from defendant in sum $30,897.66, reduced by $17,068 as a "mitigation factor." Appellant Rhoden, No. 56883, seeks reversal of the allowance of $17,068 for mitigation, contending it is entitled to judgment in sum $30,897.-66; appellant Sears, No. 56762, seeks outright reversal, contending plaintiff should be denied any recovery whatsoever. Heuer v. Ulmer, 264 S.W.2d 895 (Mo. App.1954). (Appeals taken prior to January 1, 1972.)

In 1953 Sears and Rhoden, through its predecessor, Columbia Investment Co. Inc., commenced negotiations with respect to retail store buildings and warehouse facilities in Columbia, Missouri. On October 27, 1953, the parties executed a lease and rider. The lease was "a Sears printed form" containing some eighteen printed paragraphs, and the demise provision was a typewritten referral to the attached rider. The rider demised premises in Columbia, Boone County, Missouri, described as "Lots 196, 197, 198, 253, 254, and 255 in Original Town now City, of Columbia, being the entire block bounded by Broadway, First Street, Walnut Street and Second Street * * * together with all buildings and improvements to be located or erected upon all or any part of said premises * * * to be occupied for the sale and storage of general merchandise * * * subject * * * to the zoning laws, building restrictions, regulations and ordinances * * * applicable to the demised premises."

"Tenant [Sears], in consideration of said demise," agreed to pay as rental "for said demised premises," $2,500 per month plus quarterly percentage rentals, during the 30-year term of the demise beginning upon completion of certain construction, with provisions for increases in rent based upon increases in sales.

Pertinent provisions of the rider follow:

Landlord (Rhoden) agreed to construct and erect improvements and buildings "upon said demised premises, such work to include the demolition of certain structures now situated thereon and the construction of a retail store building, a service station building, automobile parking facilities * * * all to be done in accordance with

plans and specifications furnished by Landlord and approved by Tenant * * *."

Landlord represented and warranted, E(1), that it would have good title "to the demised premises * * * and that the same [would] be free and clear of all encumbrances and liens * * *."

The parties further agreed, F(1), that "Throughout the term * * * and without payment of any further rentals by Tenant, Landlord shall furnish to Tenant a minimum of Sixty-five Hundred (6,500) square feet of usable warehouse space, but it is mutually understood that Tenant will require additional space in or near * * * Columbia for its use for warehouse purposes in connection with the operation of its retail store upon the premises demised under this lease. Landlord shall furnish, or reimburse Tenant for the 'outside rentals' paid by it for any such additional space * * * so that Tenant will have an additional Sixty-five Hundred (6,500) square feet of usable warehouse space * * * for each * * * ($1,000,000.00) * * * 'annual net sales' * * *. (2) Tenant shall give Landlord written notice of its requirements and Landlord shall have the right within Sixty (60) Days * * * to submit to Tenant a written description and offer of premises which may be used and occupied by Tenant for such purposes. * * * In the event * * * that Landlord does not offer the requested warehouse space * * * and in so far as Tenant is entitled, by virtue of the amount of its 'annual net sales' to be furnished such space by Landlord rent free, Tenant shall have the right * * * to reimburse itself for the rentals paid by it * * * for such additional warehouse space. * * * (4) If Landlord fails to pay or reimburse Tenant for any outside rentals, or whenever Tenant is entitled to reimburse itself for outside rentals, * * * Tenant shall have the right * * * to deduct and retain from the additional rentals, if any, * * * a sum or sums equivalent to the amount of such outside rentals so to be paid or reimbursed."

Rhoden constructed the required improvements on the demised premises and Sears accepted and occupied them in 1955.

The lease and rider made no demise with respect to warehouse space. Some months following execution of the lease and rider, Rhoden acquired a tract of land north of the demised premises and secured the zoning necessary to its use as a warehouse site. Rhoden constructed and furnished Sears a 9,600-square-foot Butler warehouse building on this tract. Sears participated in the design of the warehouse building and accepted and occupied it in 1955. Sears continued in occupation of the warehouse until February 1966, when it moved from the warehouse claiming it was not "usable." Sears retained possession and continued to occupy the demised premises and the retail buildings and parking lot constructed on the demised premises. Rhoden took the position that the 9600-square-foot Butler building complied with the requirement to furnish 6500 square feet of "usable warehouse space"; that "Sears and Roebuck was still the tenant" and "made no effort to lease it to anyone or to sell it." Sears began deducting from the rentals due on the demised premises the cost of other warehouse space. The deductions amounted to $27,166.78 plus interest at time of judgment in sum $3,730.88, a total of $30,897.66.

Certain additional facts and chronology are necessary to an understanding of the court's findings and the appellants' assertions:

In connection with the zoning of the warehouse tract in July, 1954, Rhoden covenanted with the City of Columbia to provide a 10-foot setback line. In September, 1954, correspondence passed between the parties respecting the need of 13,000 square feet of warehouse space in the event Sears reached its estimated goal of $2,000,000 annual sales, and the height of the floor of the warehouse.

In April, 1955, Rhoden joined with other landowners in the area in a petition to the city for construction of curbs, gutters, and permanent paving on Walnut Street between the demised premises and the warehouse site to the north. The street was improved by the city later in the year. Sears people were interested in and desired the improvement of Walnut Street.

In 1961 Columbia began enforcing a 1951 ordinance which made it unlawful for any vehicle to stop, stand, or be placed in any street, public thoroughfare, or alley, or across the footway or crossing of any street or thoroughfare so as to obstruct or interfere with the free passage of other vehicles. In this connection, certain commercial trucks could use the warehouse docks without extending into the streets. Long tractor-trailer combinations could not unload at the warehouse dock without extending into the street. Sears made use of certain over-the-road common carriers to stock its warehouse. During the period from 1955 to 1961, such carriers either used shorter tractor-trailer units or, if they used longer units which extended into the street, the authorities tolerated their violation of the ordinance. Prior to construction of the warehouse and its use by Sears, Rhoden had no knowledge of the type vehicles or manner of service it would employ in stocking the warehouse.

Also in 1961 some difficulty arose in connection with an urban renewal project.

During the period 1961–1966, negotiations between the parties and Columbia authorities resulted in abatement of enforcement of the ordinance; however, on January 20, 1966, the Columbia Police Department notified the three carriers that served the warehouse for Sears that no longer could trucks be unloaded unless they could "back in behind the sidewalk." The trucking companies then notified Sears their units could no longer make deliveries to the warehouse.

During this same period the parties attemped to settle and compromise the warehouse problem. Long trucks would have been able to continue unloading at the warehouse if the dock were redesigned and rebuilt. The negotiations broke down in dispute over who should pay for the alteration of the dock.

Also during this period, on August 10, 1965, Sears made demand for warehouse space "under one roof in the total amount of * * * 15,000 square feet and accordingly are giving you [Rhoden] written notice as provided" in the rider.

On February 3, 1966, Sears notified Rhoden that it intended to execute a lease for temporary warehouse space on February 10, 1966, "unless an acceptable solution is reached before this date." On February 9, 1966, Sears informed Rhoden it would start vacating the warehouse on February 10, 1966. Rhoden replied it was "ready, willing and able to attempt to work out something," and was "prepared to satisfy each and every obligation of landlord under said lease and insist that you [Sears] honor your obligations."

On March 14, 1966, Sears informed Rhoden that it had vacated the warehouse as of February 28, 1966. Sears rented temporary warehousing at $400 per month, increased to $500 per month January 1, 1969, all of which it deducted from rentals due Rhoden. Sears also deducted moving expenses of $1,666.78.

The court made the following pertinent findings and conclusions by way of Memorandum Opinion:

"Rhoden as lessor seeks a declaration of its rights and recovery of money deducted by Sears as lessee from rents. Although there is no dispute as to the major portion of the lease nor, for that matter, as to most of the facts, a recital of the events and circumstances will facilitate understanding of the dispute. * * *

"Following extended negotiations, Rhoden's assignor and Sears entered into a lease of certain premises in Columbia, Boone County, Missouri on October 27,

1953. The lease is a Sears' printed form of some eighteen paragraphs. Some of these are stricken and reference is made to a 'Rider, consisting of Three Hundred Ninety (390) typewritten lines.'

"The demised premises consisting of an entire block [is] bounded by Broadway, 1st Street, Walnut Street and 2nd Street. Oblique reference is made to 'demise' as embracing other realty, e. g. Paragraph A(4) —'Additional warehouse space.'

"Critical for our purpose is Paragraph F. By its terms, Rhoden is required to furnish without further rentals 6,500 square feet of 'usable warehouse space.' Subparagraph (1) continues, 'but it is mutually understood that tenant will require additional space in or near said City of Columbia for its use for warehouse purposes in connection with the operation of its retail store upon the premises demised under this lease.' Rhoden is required to furnish such 'additional space' or to reimburse Sears for its rental. 6,500 square feet is required for each One Million Dollars of annual net sales in excess of the first Million Dollars or portion thereof, but not in increments smaller than approximately 2,000 square feet.

"Subparagraph (2) sets forth the mechanics of demand for warehouse space and responsive action. Subparagraph (4) authorizes deductions from 'additional rentals, if any,' a sum or sums for outside rentals to be paid or reimbursed by Rhoden.

"Rhoden furnished a Butler type building on the north side of Walnut Street opposite Sears' parking lot on the basic tract. It contained 9,600 square feet and was designed agreeably to Sears. The space was 'usable' and was in fact used without notable problems until 1961.

"Urban Renewal reared its head with suggestions of a change in the dock for the warehouse building and brick veneer for its front. Rhoden declined to comply. The Columbia police began to pressure Sears to eliminate blocking of Walnut Street by 'long trucks.'

"On October 18, 1962, Sears took the position that Rhoden was not furnishing usable space because of the access problem and demanded space, invoking the terms of Paragraph F(2). On October 31, 1962, Rhoden denied Sears' right to invoke Paragraph F(2).

"Pressure from the Columbia police was intermittent. Meanwhile the parties attempted to work out a compromise. These negotiations are disregarded by the Court in determining the rights and obligations of the parties.

"On August 10, 1965, Sears demanded approximately 15,000 square feet 'warehouse space under one roof' and gave notice 'as provided in Section (2) of Paragraph F.' Rhoden promptly pointed out that it had been furnishing 3,100 square feet more than required, that Sears was entitled to only some 3,400 square feet in addition, and that the additional space was not required to be under the same roof.

" * * * On January 4, 1966, Sears gave notice of its intention to acquire space for itself at approximately 47½ cents per square foot and to charge the cost to Rhoden. On the following day, Rhoden reasserted its position as to the letter of August 10, 1965.

"Police pressure resumed and on January 20, 1966 letters were sent to three common carriers and to Sears advising that tractor-trailers could not be loaded or unloaded at the warehouse. The three carriers advised of their inability to serve the warehouse.

"On February 3, 1966 Sears advised Rhoden of its intention to execute a lease on February 10, 1966 for 13,000 square feet at a rental of $4,800 per annum and to deduct the cost of the substitute space and moving expenses from any additional rents due under the lease. The parties reasserted their position by telegrams of February 9 and February 10, 1966.

"On March 14, 1966 Sears advised that the warehouse had been completely vacated as of February 28, 1966 and demanded adequate, permanent warehousing space. On June 3, 1966 Sears reported expenses for the first quarter of $2,008.98—$400 rental and $1,608.98 relocation expenses. Sears did deduct these items and further warehouse rentals as they accrued.

"Did Rhoden furnish the initially required usable warehouse space? There is little doubt that it was usable in fact in 1954 and became unusable in the 60's for the Sears operation. Adequate access is essential to a warehouse. * * *

"The more difficult question is the determination of the critical date to test usability. The Court concludes that the test must be applied as of the period when the lease was executed, the warehouse was designed and built (with active participation by Sears), and the structure accepted by Sears for its purpose. In light of what then existed or could have reasonably been foreseen, Rhoden furnished the required usable warehouse space.

"Implicit in the foregoing is the conclusion that Rhoden itself did not render the space unusable for the Sears operation. Rhoden did not cause common carriers serving Columbia to extend the length of their equipment. Nor did it cause the problem by a 'secret covenant' with the City. The 10 foot set-back was not the proximate cause of inability to park tractor-trailer units without blocking the street. Nor was it a 'secret covenant.' Sears has constructive knowledge of both the covenant and the action of the city counsel before it accepted the building and took possession. There is substantial evidence to support a finding that it had actual knowledge as well.

"It follows that Sears was not constructively evicted. Had it been, Sears would not have strengthened its position or implemented remedies provided in the lease by its demand of August 10, 1965. The excess square feet already furnished was ig-nored, and the 'under one roof' requirement was without support of either law or contract.

"Sears had no basis to justify its abandonment of the warehouse and deducting moving expenses and the subsequently accruing rent on the new warehouse. But what of Rhoden's duty to mitigate damages?

"It takes no seer in real estate to know that it may be considerably more difficult to re-let a warehouse when the term of its availability is indefinite. However, it does not suffice to say that a judicial decision might terminate potential liability at any time. Rhoden has not mitigated its damages. Its recovery must be reduced by the reasonable rental value of the warehouse less reasonable expense of re-letting, considering such appropriate factors as term, location, zoning, local market, etc.

"Based on the available evidence the Court finds that Rhoden could have rented the 9600 square feet at 40 cents per square foot per annum or a monthly rental of $320.00 commencing March 1, 1966."

The judgment ordered, adjudged, and decreed that the rights of of the parties "are in accordance with the statements, findings and conclusions of law set forth in the Memorandum Opinions" and that plaintiff have and recover from Sears $13,829.66, being amounts deducted by Sears through December 31, 1970, totaling $27,166.78, plus interest of $3,730.88, less mitigation factor represented by the amount for which Rhoden could have rented the warehouse for 51 months, with interest in sum $17,068.00.

Appellant Sears contends (I) that Rhoden did not "throughout the term of this lease" furnish "usable warehouse space," thereby breaching paragraph F of the lease (rider) when it failed to provide adequate off-street parking so trucks would and could load and unload at the warehouse dock without violating Columbia ordinances and police department orders, thus

justifying abandonment of the warehouse by Sears and its deduction of expenses and outside rentals.

Pertinent portions of paragraph F of the rider have been quoted previously in the statement and in the court's findings. Sears cites Webster's International Dictionary, Second Edition, in definition of "usable" as "[T]hat can be used. [T]hat is convenient and practicable for use," adopted in Dixie Pine Products Co. v. Dyer, 178 Miss. 227, 172 So. 145 (1937). For similar definition and application of "usable right" and "usable," see Union Falls Power Co. v. Marinette County, 238 Wis. 134, 298 N.W. 598 (1941); Blazei v. Cologne, 213 Wis. 48, 250 N.W. 752 (1933). From this, Sears argues that "if a usable right is one that can be availed of then clearly a warehouse which cannot be reached by vehicles to load and unload does not fall within this classification"; and that the trial court was correct in finding "that the warehouse is not usable at the present time."

This argument is fraught with two difficulties: First, it is clear from the evidence that both common carrier and Sears trucks can use the warehouse dock; only long over-the-road trucks became the target of police action. Second, the court's finding was not as stated by Sears; rather, it was that the warehouse space "became unusable in the 60's for the Sears operation," i. e., if the Sears operation was to continue use of common carriers, who, in turn, continued to increase the length of their over-the-road trucks, then a different arrangement became necessary.

■ The test of the meaning of words commonly used is their ordinary and popular meaning, and they should not be construed in the broadest sense possible to include meanings to which they would not be applied by most people. Cleaver v. Central States Life Ins. Co., 346 Mo. 548, 142 S.W.2d 474 (1940). Accordingly, the burden is on the party who claims a special meaning of commonly used words was intended.

Landau Grocery Co. v. Hart, 223 S.W. 793 (Mo.App.1920); Kalen v. Steele, 341 S.W.2d 343 (Mo.App.1960); Potter v. Phenix Ins. Co., 63 F. 382 (W.D.Mo.1894); 17A C.J.S. Contracts § 586. There is no evidence from Sears to show that the parties intended in their employment of "usable" in the rider to ascribe a unique and special meaning such as "usable for the Sears operation," and there is evidence to show that Rhoden did not know and that the parties did not discuss any use of common carriers, long and longer trucks, or any method Sears might employ in its use of the warehouse. Shown also is that Sears participated in planning all construction; that it accepted, occupied and used the warehouse; and that only when it encountered unforeseen obstacles did it question whether Rhoden had furnished the required "usable warehouse space." The situation is comparable to Soresi v. Repetti, 76 A.2d 585 (D.C.App.1950). Plaintiff leased a building to defendant for use as a newspaper publishing house. Defendant occupied the premises but later abandoned because the building inspector would not permit installation of a particular paper cutter on the ground the floor was not sufficiently strong to support it. The suit was for rent of the abandoned premises, and the court, in finding for plaintiff, observed: "The defendant admits that he examined the premises before signing the lease. While such lease specifically stated that defendant was to carry on a 'publishing business', there was no duty on the part of the landlord to ascertain the weight of a particular type of machine which defendant desired to install on the premises." 76 A.2d 1. c. 586.

In this connection Sears attacks the court's determination and finding with respect to the date to test usability. Sears argues that the finding is without support in law, is totally erroneous and ignores completely the plain language of paragraph F(1), and that "the unmistakable meaning of such language is that from the date of its execution and throughout every day of

its 30 year term, plaintiff had the duty to supply usable warehouse space to Sears."

■ This argument is made without authority. It contradicts appellant's expression in its letter to Rhoden, February 3, 1966, that the issue is " 'usable warehouse space' as contemplated by the parties at the time of execution of the lease"; and it already has been demonstrated that Rhoden met its obligation under paragraph F(2) to furnish "usable warehouse space," although such may have become "unusable in the 60's for the Sears operation." The court's finding in this respect is consistent with the rule that agreements are to be interpreted in the light of the circumstances and the intent of the parties when they enter into the agreement. Ambassador Bldg. Corp. v. St. Louis Ambassador Theatre, 238 Mo.App. 600, 185 S.W.2d 827 (1945); 17A C.J.S. Contracts § 295(e).

Implicit in the court's finding in this respect is that Sears is estopped from claiming that Rhoden failed to furnish the "usable warehouse space" required by paragraph F(1). As properly found by the court, Sears participated in the design and construction of the warehouse, and accepted and occupied it. Only after unforeseen difficulties, not chargeable to Rhoden, arose, did Sears indicate its intention to abandon and accomplish its abandonment of the warehouse under a claim that "usable warehouse space" meant other than that designed, constructed, accepted, and occupied under the agreement. "It is well established that the interpretation placed on the contract by the parties prior to the time it became a matter of controversy is entitled to great, if not controlling, influence in ascertaining the intent and understanding of the parties and the courts will generally follow such practical interpretation." South Side Realty Co. v. Hamblin, 387 S.W.2d 224, 229 (Mo.App.1964).

In summary, Rhoden "furnished" the warehouse Sears wanted; it is available for use by Sears; and Sears may not now argue that a different warehouse was intended. The warehouse furnished was and is "usable warehouse space" as that language is ordinarily understood, and there is no showing of a special meaning ascribed to that language by the parties at the inception of their agreement.

■ Appellant Sears contends (II) that Rhoden failed to provide off-street unloading facilities, thus making it impossible for trucks delivering to Sears to use the warehouse in question without violating the ordinances of Columbia; that plaintiff thus breached paragraphs Second and Fifteenth of the lease and justified abandonment of the warehouse by Sears and its deduction of outside rentals and expenses. Relatedly, Sears contends (III) that Rhoden's execution of the 10-foot building setback covenant July 13, 1964, was a breach of paragraph Fifteen of the lease, and this, together with the city ordinance, constituted violations and breaches of paragraph E of the rider, thus justifying abandonment of the warehouse by Sears and its deduction of expenses and outside rentals.

Appellant refers to paragraphs Second and Fifteenth of the lease, which provide in part as follows:

"SECOND: Landlord covenants that Landlord will, on or before the beginning of the term hereof, deliver possession of said demised premises to Tenant in good condition and repair, ready for said occupancy, free and clear of all tenancies and occupancies, with all the additions, alterations and repairs in this lease provided to be made by Landlord fully completed; and that in addition to making the additions, alterations and repairs, if any, herein specifically provided for, Landlord will, at his own expense, make such further additions, alterations and repairs as may be necessary to make said demised premises and all fixtures, equipment and appurtenances belonging to, in or about said demised premises (not including, however, the fixtures, equipment and appurtenances of Tenant) comply at the beginning and during the term hereof with the laws of said state, or-

dinances of said city, and regulations applicable to said demised premises and the use thereof as aforesaid. * * *

"FIFTEENTH: Landlord covenants that Tenant, on paying the rental and performing the covenants as aforesaid, shall and may peaceably and quietly have, hold and enjoy the demised premises for the term aforesaid."

Appellant refers also to paragraph E of the rider, which provides:

"PARAGRAPH E: (1) Landlord represents and warrants that at and prior to the commencement of the term of this lease, Landlord will have good title to the demised premises and all machinery, equipment and fixtures located thereon (except machinery, equipment and fixtures, if any, belonging to Tenant), and that the same will be free and clear of all encumbrances and liens whatsoever except the lien of current taxes and the lien of a mortgage or trust deed in the nature of a mortgage to secure a principal indebtedness not to exceed Four Hundred Fifty Thousand Dollars ($450,000) and that such mortgage or trust deed shall be made subject to the terms of this lease. Prior to or at the commencement of, or at any time during the term of this lease, and if so required by Landlord in writing, Tenant will subordinate this lease to the lien of any valid and enforceable mortgage or trust deed on the condition, however, that Tenant's peaceable and quiet possession of the premises demised hereunder will not be disturbed on account thereof, and by reason of anything done or caused to be done thereunder, so long as Tenant pays the rentals (less the deductions, if any, herein provided for), and further performs the covenants and agreements on its part contained in this lease."

The difficulty in appellant's position is demonstrated by reference to the quoted provisions. By their express terms, they apply only to the "demised premises" which were expressly and legally described and were the premises upon which the retail store building and parking lot were constructed by Rhoden and occupied and still occupied by Sears, and to which all the rentals applied. The exact description of the "demised premises" does not include the minimum 6500 square feet of "usable warehouse space" agreed to be "furnished" Sears by Rhoden, "without payment of any further rentals," in paragraph F of the rider and in issue in this action. The only reference to warehouse space in connection with the demise of premises in the lease and rider is that termed "oblique" by the court in paragraph A(4) which speaks of "additional warehouse space" which may be included in the demise of the lease. The word "furnish" does not mean "demise"; and if it was intended that the warehouse space in question be a part of the demise to be governed by the title requirements and covenants of paragraphs Second, Fifteenth and E, it would have been a small matter to have included it within the exact legal description employed in connection with the demised premises. The situation is similar to Godfrey v. Martha Inv. Co., 216 S.W. 822 (Mo.App.1919), where the question was whether "premises" in a construction contract included an adjacent right of way. Plaintiff had contracted to build a factory on certain "premises" of defendant, "all surplus earth to remain on the premises." Under another instrument arising from the same negotiations, plaintiff was to fill the right of way with earth for 20¢ per cubic yard. Plaintiff used dirt from the construction site for the fill and defendant sought to avoid payment of the 20¢ per cubic yard on grounds the right of way referred to in the construction contract was part of the "premises" and therefore no payment was due. In denial of defendant's contention, the court stated: "The specifications which are a part of the building contract define the limits and location of the lot on which the factory building was to be constructed. This description does not include the defendant's right of way over the adjoining lot. In light of these facts we can but read the word 'premises' as used in said

contract and specifications as referring only to the lot described therein." 216 S. W. l. c. 824.

In summary, it is clear that Rhoden and Sears were not leasing a specific warehouse, and the land upon which the warehouse was constructed was acquired after execution of the lease and rider. It is equally clear that the parties were concerned with basic warehouse space in terms of a minimum of 6500 square feet and possible additional warehouse space "in or near" Columbia. The specific legal description of the "demised premises" was critical to the lease, and express language and an attached scale drawing were employed to accomplish the description. Warehouse space was to be "furnished" as opposed to "demised"; "additional warehouse space" was the only warehousing that "may be included in the demise" of the lease; and, as opposed to title, it was necessary only that Rhoden "furnish" the basic warehouse space.

Appellant Sears asserts (IV) that the actions of Rhoden in breaching the lease, "as set out in prior sections" of its brief, amounted to a constructive eviction of Sears from the warehouse, renders Rhoden liable for all of defendant's damages directly resulting from such breaches, including moving expenses and outside warehouse rental payments, and entitled Sears to deduct same from rent due Rhoden under the lease. Relatedly, Sears asserts (VI) that plaintiff is liable to defendant for all damages sustained as a direct result of plaintiff's breaches of the lease, and is entitled to deduct the same from rent due plaintiff under the lease.

■ As previously demonstrated in resolution of appellant's "prior" Points I, II, and III, there was no breach of the lease by Rhoden as alleged by Sears; hence, there was no constructive eviction on those accounts. Appellant's cases on constructive eviction under Point IV are premised on wrongful acts of the landlord or breach of the lease by the landlord, and since those matters are absent from this record, discussion of the cases would be academic. Also absent the breaches as alleged, plaintiff incurred no liability for damages on account of the breach.

Appellant Sears asserts (V): Assuming for purpose of argument that Sears wrongfully abandoned the warehouse in issue, Rhoden's failure to submit to Sears a written description and offer of additional warehouse space, as provided in paragraph F of the rider, entitled Sears to deduct from payments made to Rhoden the cost of renting such additional warehouse space.

In this connection, the court found that the alleged demand of Sears for additional warehouse space was not in accordance with paragraph F because "the excess square feet (9600 square feet furnished for a required 6500 square feet minimum) already furnished was ignored, and the 'under one roof' requirement was without support of either law or contract."

■ Appellant does not attempt in any way to demonstrate this finding to be erroneous; and only upon demand, conformed to the provisions of paragraph F by Sears and election by Rhoden not to furnish the additional warehouse space, can Sears invoke the provision of paragraph F to proceed on its own to rent additional space and charge it against rentals due Rhoden. Kalivas v. Hauck, 365 Mo. 923, 290 S.W.2d 94, 101 [4] (1956).

Appellant Rhoden contends the court erred in its finding that plaintiff had a duty to mitigate damages and in reducing Rhoden's judgment by the amount of the "mitigation factor" found and applied by the court.

■ Whitehorn v. Dickerson, 419 S.W. 2d 713 (Mo.App.1967), involved an admitted abandonment of leased premises by defendant tenant and the duty *vel non* of plaintiff landlord to mitigate damages. The court observed, 419 S.W.2d l. c. 718 [8]: "* * * if counsel's search for a controlling Tennessee or Missouri case is

no more productive or conclusive than ours has been, precedents in other jurisdictions will become persuasive. * * * In that event, it may be said confidently that the overwhelming weight of judicial authority elsewhere is that, in the absence of a provision in the lease to the contrary, lessor is under no duty to seek a new tenant when the latter abandons the leased premises prior to expiration of the term but may let the premises lie idle and collect the rents reserved as they accrue." Consolidated Sun Ray, Inc. v. Oppenstein, 335 F.2d 801 (8th Cir. 1964), stated that under the law of Missouri the landlord, upon default of the tenant, has three options: 1. To remain out of possession, treat term as subsisting and recover rent; 2. To give notice to tenant, resume possession and relet to mitigate damages, collecting loss from tenant; 3. To re-enter, resume possession in own right and close the term. See also Babcock v. Rieger, 76 S.W.2d 731 (Mo. App.1934); Jennings v. First Nat. Bank of Kansas City, 225 Mo.App. 232, 30 S.W.2d 1049 (1930); Von Schleinitz v. North Hotel Co., 343 Mo. 1110, 23 S.W.2d 64 (1929); Anno. 21 A.L.R. 3rd 546.

Sears would resist application of these authorities to Rhoden's appeal and would support the court's mitigation factor by reference to clause Tenth of the lease, which provides in part: "If tenant abandons said premises, the Landlord shall relet the same for the best rent obtainable * * *."

■ "Premises" in this provision, when considered in the context of the entire lease and rider, refers to and can mean only "demised premises." This demonstrates the error in the position taken by Sears because Sears assumes that the warehouse space in question was a part of the "demised premises." However, as pre-

viously demonstrated in connection with points II and III, urged by appellant Sears, the warehouse space in question was not included in the demise of the lease and rider. The lease provision which Sears now claims to impose a duty upon Rhoden to relet, applies only to "demised premises." This resolution of the question is emphasized also by paragraph F(1) of the rider which requires Rhoden to "furnish" the warehouse space in question "without payment of further rentals" by Sears. The warehouse had value in connection with use of the demised premises, but the parties did not attribute any rent to it. Consequently, as a practical matter, how can Sears claim its liability for rent of the demised premises should be diminished upon its failure to use that which, by the agreement, was to be furnished without additional cost? In this connection, there was no rent attributable to the warehouse to be severed from the total rental of the demised premises.

For these reasons the Sears appeal, No. 56,762, must be denied, and Rhoden's appeal, No. 56,883, must be sustained.

Accordingly, the judgment is reversed insofar as it allows defendant $17,068 as a "mitigation factor"; and the cause is remanded with direction to enter judgment for plaintiff against defendant for the full rent earned, $30,897.66.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court. BARDGETT, P. J., and SEILER and FINCH, JJ., concur.

HOLMAN, J., not sitting.