Warren H. KAWIN, et al.,
Appellants-Respondents,

v.

CHRYSLER CORPORATION, et al.,
Respondents-Appellants.

No. 62863.

Supreme Court of Missouri,
En Banc.

July 6, 1982.

Rehearing Denied Aug. 2, 1982.

.. 

RENDLEN, Judge.

Warren and Alice Kawin brought their action against the manufacturer Chrysler Corporation (Chrysler) and Robert G. Spellbrink, Chrysler's St. Louis area field service engineer, for breach of warranty and fraudulent merchandising practices in their sale to plaintiffs of a Chrysler Airtemp central air conditioner.[1] At the close of the evidence, plaintiffs dismissed as to Spellbrink and the court granted Chrysler's motion for directed verdict on Kawins' fraud claim. The breach of warranty claim was submitted to the jury which found for Chrysler and judgment was entered on that verdict. Chrysler's motion for attorney's fees under § 407.025, RSMo 1978, was denied by the trial court and plaintiffs and defendant Chrysler each sought review in the Court of Appeals, Eastern District, where the judgment was affirmed. Transferred here, the cause is reviewed as though on original appeal. Art. V, § 10, Mo.Const., Rule 83.09.

Plaintiffs contend the trial court erred: (1) in overruling plaintiffs' motion for directed verdict on Count I (breach of warranty) and rejecting instruction "A" proffered by plaintiffs, which would have declared as a matter of law that Chrysler's warranty for replacement of a defective compressor required replacement with a *new* rather than a *rebuilt* compressor, (2) by granting defendant-Chrysler's motion for directed verdict as to Count II (fraud) because the uncontroverted evidence established a fraudulent concealment by defendant of a material limitation of the warranty on its air conditioner, and (3) in refusing to take judicial notice of certain Federal Trade Commission regulations and rejecting their admission into evidence.

Chrysler asserts the trial court erred in denying its motion for attorney's fees to which it was entitled as a prevailing party under § 407.025, RSMo 1978, the Missouri Merchandising Practices Act.

Leonard Komen, Warren H. Kawin, Clayton, for appellants-respondents.

Stuart Oelbaum, St. Louis, for respondents-appellants.

1. Plaintiffs' amended petition was in two counts, Count I for actual damages in the amount of $10,000 for breach of warranty in Chrysler's refusal to furnish a new compressor to replace the defective unit. Count II sought actual and punitive damages of $110,000 for fraudulent merchandising practices in Chrysler's concealment of a material limitation of the warranty, i.e. that it was Chrysler's policy to replace defective compressors with rebuilt rather than new units.

On September 3, 1968, plaintiffs contracted with American Allied Air Conditioning Company for the purchase of a Chrysler Airtemp air conditioner for their home. Shopping for an air conditioner backed by a reputable company which gave the most favorable warranty terms, Mr. Kawin investigated several other brands and before purchasing the Chrysler unit, obtained a specimen warranty from the American Allied representative, relevant portions of which are as follows:

Airtemp Division of Chrysler Corporation warrants its Packaged Air Conditioning or Heating Product identified below to be free of defects in workmanship and material under normal use and service. Airtemp's obligation under this warranty is limited solely to *repairing or replacing parts* F.O.B. Dayton, Ohio, which in its judgment are defective in workmanship or material and which are returned, freight prepaid, to its Dayton, Ohio plant or other designated point.

\* \* \* \* \* \*

The above warranty applies for a period of one year from date of original installation.

The Hermetic Compressor . . . is warranted for a period of five (5) years from date of original installation.

\* \* \* \* \* \*

GENERAL PROVISIONS

Airtemp makes this warranty in lieu of all other warranties, express or implied. In no event shall Airtemp be liable for special or consequential damages. . . . (Emphasis added).

Installation was completed in October, 1968, and plaintiffs operated the air conditioner that fall for about one week. The unit, next operated in June and July, 1969, functioned poorly, and required six service calls during that period. The problems ended when the unit's air compressor was replaced in July of that year.

The air conditioner functioned properly until the end of July, 1972, when it again began running poorly. Plaintiffs were then informed by George Gilbert, in the Chrysler parts department, that a rebuilt compressor was available. Mr. Kawin called Mr. Spellbrink, Chrysler's field service engineer in St. Louis, advising that he was willing to pay the installation cost as required in the warranty, but he wanted a *new*, not a *rebuilt* compressor. Spellbrink responded that under the warranty Chrysler could furnish new or remanufactured compressors, and it was their policy to furnish the latter. Mr. Kawin refused the offer of a rebuilt compressor and purchased another air conditioner.

At trial, Mr. Kawin admitted neither the specimen warranty he examined before purchase nor the warranty received from Spellbrink contained representations that Chrysler would replace defective parts with new parts. In addition, Spellbrink testified he was not aware of any Chrysler literature, advertisement, or specification that replacement would be with a new, vis-a-vis a rebuilt part. Further it was Chrysler's policy to replace, rather than repair, as the cost and quality of work in remanufacturing plants was superior to those of servicemen in the field.

I.

Plaintiffs first contend the trial court erred in overruling their motion for directed verdict as to Count I, the breach of warranty claim, and in refusing their proffered Instruction A which declared as a matter of law that Chrysler's warranty provision for replacement meant replacement with *new* rather than *rebuilt* parts.[2]

The contested portion of the warranty provided that "Airtemp's obligation . . . is limited solely to repairing or replacing parts

---

2. Instruction A directed:
　　Under the law, defendant, Chrysler Corporation, is liable to plaintiffs for damages in Count I of this case. Therefore, you must find the issues in favor of plaintiffs on Count I and award plaintiffs such sum as you believe will fairly and justly compensate plaintiffs for any damages, including incidental and consequential damages, you believe they sustained as a direct result of the breach of warranty mentioned in the evidence.

..."". Plaintiffs seek to extrapolate the phrase by inserting the words "with new", so the challenged phrase would read "Airtemps obligation ... is limited solely to repairing or replacing [with new] parts ...". The term "replace", given its plain and ordinary construction, means to supplant with a substitute or equivalent. *Olenick v. Government Employees Insurance Co.*, 42 A.D.2d 760, 346 N.Y.S.2d 320, 321 (1973); Black's Law Dictionary 1168 (5th ed. 1979). Clearly, a remanufactured part in good condition is the equivalent of a part employed in a unit for a period of time as here. Because a new part is more than equivalent to a used part, plaintiffs are alleging an interpretation of "replacing" beyond its ordinary meaning.[3]

■ A party asserting a special meaning of an unambiguous commonly used term bears the burden of establishing that such a construction was intended. *Rhoden Investment Company, Inc. v. Sears, Roebuck and Company*, 499 S.W.2d 375 (Mo. 1973); *Landau Grocery Co. v. Hart*, 223 S.W. 793 (Mo.App.1920). In this regard plaintiffs adduced no evidence other than their personal interpretation of the term "replacing". They offered nothing such as business or trade usage or course of dealing between the parties, to demonstrate that under the circumstances, replacement was intended to be accomplished with new rather than rebuilt parts. On plaintiffs' failure to meet their burden, the trial court would have been justified in directing a verdict for defendant, but instead submitted construction of the warranty phrase for the jury's determination. The jury appropriately held for defendant, and plaintiffs may not be heard to complain of error (if error it was) committed in their favor.

## II.

Plaintiffs next allege the trial court erred in directing a verdict against their claim of fraud under Count II. They assert it was Chrysler's legal duty to disclose the material limitation of the warranty, that replacement of a defective air conditioner compressor meant with a rebuilt rather than new part, and Chrysler's failure to disclose this limitation constituted actionable fraud.

■ To make a submissible claim of fraud, plaintiffs must prove defendant intended to deceive. "It is well established in our law that there must be scienter, either actual or constructive, to support an action at law for fraud and deceit. Scienter implies guilty knowledge by the tort feasor or a guilty lack of knowledge .... The misrepresentation must be made with intent to deceive, 'or with what is recognized as the legal equivalent to a deliberately fraudulent intent to deceive.' " *Dudley v. Dumont*, 526 S.W.2d 839, 847 (Mo.App.1975).

■ In the case at bar, plaintiffs failed to establish Chrysler intended to deceive plaintiffs by not disclosing in its warranty or elsewhere that replacement occurred with rebuilt and not new parts. Indeed, as discussed above, the ordinary meaning of the word "replace" in the circumstance here does not require satisfaction with new parts, which negates the claim of intent to deceive. Chrysler offered evidence that it had long been the company's policy to replace defective compressors with remanufactured units. Plaintiffs introduced nothing in rebuttal. For example, no evidence was offered of the air conditioning industry's practice concerning replacement of parts and whether Chrysler's practice was contrary, or similar evidence which might support an inference of knowledge by Chrysler that its warranty limitation was deceptive. Absent a showing of scienter, there could be no finding of fraud, hence, the court properly directed a verdict for defendant on Count II.

## III.

■ Plaintiffs next charge the trial court erred in refusing to take judicial notice of the Federal Trade Commission regulations,

3. If the compressor had failed when first operated or very soon thereafter, the term "replace" might require replacement with a "new part" so that the replacement would equate the part removed, but such is not this case.

16 C.F.R. §§ 26.2 and 26.12 (1968), and in sustaining defendant's objection to the introduction of the regulations into evidence. By congressional authority, the Federal Trade Commission is empowered to promulgate regulations implementing the provisions of 15 U.S.C.A. § 45(a)(1), which proscribes unfair methods of competition and unfair or deceptive acts and practices in or affecting commerce. 16 C.F.R. §§ 26.2 and 26.12, two such regulations, established standards for the air conditioning industry.

Section 26.2 provided:

In the sale, offering for sale, or installation of industry products, it is an unfair trade practice to use, or cause to be used, any guarantee or warranty which is *false, misleading, deceptive*, or *unfair* to the purchasing or consuming public, whether in respect to quality, construction, serviceability, or performance of any industry product.

(a) The foregoing inhibitions of this section are to be considered as applicable with respect to any guarantee or warranty in which the terms and conditions relating to the obligation of the guarantor or warrantor are impractical of fulfillment.

(b) It is also an unfair trade practice to make or offer any guarantee or warranty respecting an industry product unless the nature and extent of the undertaking, and any and all material conditions and limitations applicable thereto, are clearly and conspicuously stated in immediate conjunction therewith, and unless the obligations of the guarantor or warrantor with respect to the guarantee or warranty are scrupulously fulfilled. 16 C.F.R. § 26.2 (Emphasis added).

Section 26.12 directed:

(a) It is an unfair trade practice to represent, directly or indirectly, that any industry product or part thereof is new, unused, or rebuilt, when such is not the fact.

(b) In the *marketing of industry products* which are second-hand or rebuilt, or which contain second-hand or rebuilt parts, it is an unfair trade practice to fail to make full and nondeceptive disclosure, by a conspicuous tag or label firmly attached to the products, and in all advertising and promotional literature relating thereto, of the fact:

(1) That such products are second-hand, rebuilt, or contain second-hand or rebuilt parts, as the case may be, when such products have the appearance of being new; or

(2) That the rebuilding of rebuilt products was done by other than the original manufacturer, when such is the case. 16 C.F.R. § 26.12 (Emphasis added).

Missouri courts have held that rules and regulations promulgated by government agencies, pursuant to delegation of authority by Congress, may have the force and effect of law and that such rules and regulations shall be judicially noticed. *Macalco, Inc. v. Gulf Insurance Company*, 550 S.W.2d 883, 887 (Mo.App.1977). Plaintiffs contend the regulations were relevant as to Count I (breach of warranty) to determine the "reasonable commercial standards of fair dealing in the trade" under § 400.2–103(1)(b), RSMo 1978, that must be met by a merchant for his conduct to be in good faith, and to establish a written trade code constituting a usage of trade under § 400.1–205(2), RSMo 1978, which explains or supplements a warranty. As to Count II (fraud), plaintiffs assert the regulations were relevant to the legal requirement that Chrysler's warranty *disclose* all material conditions and limitations of the warranty. Examination of the regulations, however, reveals they are not relevant to plaintiffs' action against Chrysler. Section 26.2 renders it an "unfair trade practice" to use "false, misleading, deceptive, or unfair" warranties, and further provides examples of warranties deemed nonconforming, including, *inter alia*, ambiguous specification of the warranty's limitations. Section 26.2(b). However, because, as discussed above, we have found under the facts here that as a matter of law the warranty was not unclear and ambiguous, it therefore was not "false, misleading, deceptive, or unfair" and § 26.2 is inapt. Accordingly, this contention is denied.

As to § 26.12, though that section purports to require disclosure when a product or part is rebuilt (as opposed to new), application of that regulation is facially limited to the *marketing* of rebuilt products or parts. In the case at bar, marketing was accomplished when the air conditioner (concededly new) was sold to the Kawins in 1968. The replacement of the used compressor with one that was remanufactured did not occur until Chrysler's attempt to satisfy the warranty obligations much later. Plaintiffs have cited no authority (and we find none) which holds that the "marketing" of a rebuilt product or part includes the fulfillment of the warranty terms long after the sale has been completed. Hence, we conclude that as Chrysler's actions in replacing the compressor with a rebuilt unit, in satisfying its warranty obligation, were not encompassed within the term "marketing" of the unit, the requirements of § 26.12 were not pertinent to this cause and the trial court's refusal to take judicial notice or admit the regulations in evidence resulted in no prejudice to plaintiffs requiring reversal.

### IV.

■ Chrysler charges that the trial court erred in denying attorney's fees for defendant-Spellbrink, who Chrysler claims was a prevailing party, invoking § 407.025.1, RSMo 1978, which authorizes an award of attorney's fees to a party prevailing in an action brought under § 407.025 for violation of § 407.020. However, plaintiffs' action was *not predicated on* Chapter 407, RSMo 1978 (the Missouri Merchandising Practices Act), and § 407.020 was merely cited by plaintiffs as establishing legislative policy with respect to common law actions for fraud.[4] Because the original action was not brought under Chapter 407, the trial court did not err in overruling the motion for attorney's fees sought under § 407.025.-1, RSMo 1978.

Affirmed.

DONNELLY, C. J., WELLIVER and MORGAN, JJ., concur.

BARDGETT, J., dissents in separate dissenting opinion.

SEILER and HIGGINS, JJ., dissent and concur in separate dissenting opinion of BARDGETT, J.

BARDGETT, Judge, dissenting.

I respectfully dissent. I believe that when these appellants, ordinary purchasers, bought the new air conditioner they were entitled to get what they had bargained for and what Chrysler had warranted to provide—a new article, free from defects, that operated according to specifications. This the Kawins did not receive.

In the summer of 1968, the Kawins sought to replace the central air conditioning in their home. Before making such an expensive purchase, the Kawins had shopped for a central unit backed by a reputable company that gave the most favorable warranty terms. Having read Airtemp's specimen warranty, the Kawins, in September 1968, entered into a contract to purchase a Chrysler central air conditioning unit and its warranty, paying over $2,000. In October 1968, the unit was installed.

The next summer the Kawins used the central unit and it failed to operate properly. After six service calls,[1] the problems

**4.** Section 407.025, which grants the trial court a discretionary right to award attorney's fees to the prevailing party in an action for violation of § 407.020, was not enacted until 1973, after accrual of plaintiffs' cause of action. Laws of Missouri 1973, H.B. 55. This newly created substantive right for attorneys fees is available in causes of actions arising after the effective date of the statute. See, *State ex rel. St. Louis-San Francisco Railway Co. v. Buder*, 515 S.W.2d 409 (Mo. banc 1974); *Center School*

*District No. 58 of Jackson County v. Kenton*, 345 S.W.2d 120 (Mo.1961).

**1.** Although not raised by this case, the repeated failure to repair the air conditioner alone might have been sufficient to breach the warranty. As stated in *Givan v. Mack Truck, Inc.*, 569 S.W.2d 243 (Mo.App.1978):

When a manufacturer limits its obligation to repair and replacement of defective parts, and repeatedly fails to correct the defect as promised within a reasonable time, it is liable

ended when Chrysler replaced the defective compressor. Three years later in 1972, the compressor, which was still under warranty, proved defective. Chrysler offered to "replace" the defective compressor with a rebuilt one—a used part. The Kawins, properly I think, asked that a new compressor be installed. Chrysler refused. As a result, the Kawins brought suit claiming that (1) Chrysler breached the warranty by refusing to furnish a new compressor to replace the defective one and (2) Chrysler perpetrated a fraudulent merchandising practice by concealing a material limitation of the warranty, *i.e.*, the company replaced defective parts with rebuilt ones, not new parts.

Although the failure of the part took place almost four years after the Kawins bought the unit, it is undisputed that the warranty, with respect to the compressor, was still in full force. Under this contract, the length of time plays no part whatsoever. And under this contract, I believe that its clear, unambiguous terms obligated Chrysler to provide a new air conditioning unit free from defects. In the event the unit was defective, then Chrysler was obligated to put it in the warranted condition so that the purchaser would receive what Chrysler had guaranteed—a *new* unit free from defects.

The relevant provisions of that warranty state:

Airtemp Division of Chrysler Corporation warrants its packaged air conditioning or heating product identified below to be free of defects in workmanship and material under normal use and service.

Airtemp's obligation under this warranty is limited solely to repairing or replacing parts fob Dayton, Ohio, which in its judgment are defective in workmanship or material, and which are returned freight prepaid to its Dayton, Ohio plant or other designated point.

The above warranty applies for a period of one year from date of original installa-

tion. The hermetic compressor ... is warranted for a period of five years from date of original installation.

General provisions: Airtemp makes this warranty in lieu of all other warranties, express or implied. In no event shall Airtemp be liable for special or consequential damages.

The principal opinion holds that under the terms of this warranty Chrysler did not breach its obligations by offering to "replace" the defective compressor with a rebuilt one. In so holding, the principal opinion defines the word "replace" as "to supplement with a substitute or equivalent." The sources cited for this definition, however, are wholly inapplicable.

The principal opinion cites Black's Law Dictionary 1168 (5th ed. 1979) in support of its construction of "replace". This definition of "replace" in Black's Law Dictionary, however, simply cites *Olenick v. Government Employees Ins. Co.*, 42 A.D.2d 760, 346 N.Y.S.2d 320 (1973)—the other source cited by the principal opinion to support its definition of "replace". I believe that when a term appears in Black's Law Dictionary with a case citation, the meaning is really derived from the case and should be understood in the context of the cited case and not apart from it. And, in examining *Olenick*, it becomes clear that the definition of "replace" is lifted from a context inapplicable to the instant case.

In *Olenick*, a liability insurance policy contained a clause whereby liability would be insured against if the car involved in the collision was a replacement for the one described in the policy. The court was construing a clause in an automobile liability policy with respect to bodily injury and property damage coverage. The word "automobile" as used in the policy "means not only the automobile described in the policy, but also a 'temporary substitute automobile' and a 'newly acquired automobile.'" *Olenick v. Government Employees*

for the breach of that promise as a breach of warranty.... Furthermore, the buyer is not bound to permit the warrantor to tinker with the article indefinitely in the hope that it may

ultimately be made to comply with the warranty.

*Id.* at 247 (footnotes omitted) (citations omitted).

*Ins. Co.*, 68 Misc.2d 764, 773, 328 N.Y.S.2d 50, 59–60 (Sup.Ct.1971), *aff'd as modified*, 42 A.D.2d 760, 346 N.Y.S.2d 320 (1973). This usual provision regarding a newly acquired automobile is sometimes referred to as the replacement car coverage—that is to say, if the newly acquired car *replaces* the automobile described in the policy, the liability insurance continues with respect to the newly acquired car. The issue before the Appellate Division was whether, in this context, the second car replaced the first so as to afford continuing liability coverage for personal injury and property damage. Resolution of this issue turned on whether the first car, a Buick, had been disposed of or was incapable of further service at the time the second car was acquired. The Appellate Division of the Supreme Court of New York, after reciting certain facts, held:

> That policy, which was issued by Liberty Mutual to Phyllistine Bryant, the purported owner, contained a "replacement provision" which essentially provided that a newly acquired automobile which is acquired "by the named insured or * * * [her] spouse" is covered by the same policy issued with respect to the car originally insured, if, in fact, the newly acquired car replaces the originally insured car.
>
> We agree with Liberty Mutual that the word "replace", given its plain, ordinary meaning, means to supplant with a substitute or equivalent. Thus, in order for the Pontiac to have replaced the Buick, there must have been evidence showing that the Buick *had been disposed of or was incapable of further service at the time of the replacement* (see *Yenowine v. State Farm Mut. Auto. Ins. Co.*, 6 Cir., 342 F.2d 957; *State Farm Mut. Auto. Ins. Co. v. Shaffer*, 250 N.C. 45, 108 S.E.2d 49; *Mitcham v. Travelers Ind. Co.*, 4 Cir., 127 F.2d 27; *Lynam v. Employers' Liab. Assur. Corp.*, D.C., 218 F.Supp. 383). The instant record is barren of any such evidence.

42 A.D.2d at 761, 346 N.Y.S.2d at 321 (emphasis added).

English words are regularly used in differing contexts and as a result take on different meanings. As the court of appeals recognized in *Adams v. Covenant Sec. Ins. Co.*, 465 S.W.2d 32 (Mo.App.1971):

> The word "replace" is not ambiguous. It means [in the context of an insurance replacement clause] "to take the place of; to serve as a substitute for or successor of." Webster's Third New International Dictionary. *Nonetheless the word "replace" does have a flexible meaning, depending on the sense in which it is used.* (Compare use of the word "permission" in *Winterton v. Van Zandt*, supra, [17] [351 S.W.2d 696 (Mo.)].) The test of the meaning of non-technical words in an insurance policy is not merely the meaning implied to them by the insurance experts who drafted the policy; instead, *courts are more concerned with the meaning that would ordinarily be understood by the layman who bought and paid for the policy. Greer v. Zurich Insurance Company*, Mo., 441 S.W.2d 15 [12]; *Hammontree v. Central Mutual Insurance Co.*, Mo. App., 385 S.W.2d 661 [3–6].

*Id.* at 34 (emphasis added).

It seems obvious that the use of the *Olenick* construction of "replace" is completely out of context and has no application to this case. No one would suggest that when one buys a new car and disposes of an older car that their values are the same. *Olenick* simply did not involve any obligation on anyone's part to repair or replace anything. To utilize *Olenick* as authority in this case would be to say that Chrysler Corporation would have satisfied its warranty obligation by installing a ten-year-old air conditioner in the Kawins's home when the new one did not work, on the premise that the old one replaced the new one as the air conditioning unit in Kawins's home. One might "replace" an old car with a new one or a new one with an old one, but that act on the part of an individual (insured) has no bearing whatever on the meaning of a warranty provision whereby the seller (Chrysler) is under a contractual obligation to "replace or repair" defective parts in the equipment it sells to a purchaser. It made no difference in *Olenick* what type, model, or year the newly acquired car was, just so it func-

tioned as transportation. The real issue under that particular insurance provision was whether the first car had been *disposed of or was inoperable* as an automobile. If so, the newly acquired car replaced the insured vehicle, and if not, it didn't.

The *Olenick* case does demonstrate, however, that the meaning ascribed to words depends on the context in which they are used. And, in my opinion, "replace" in the context of a new equipment purchase means to replace that which was bought—new parts. Nevertheless, the principal opinion uses *Olenick* for its definition of "replace" and sets up a strawman to defeat the Kawins's claim. It finds that appellants want to use the word "new" in front of the word "parts". But, the principal opinion finds that under the warranty Chrysler's promise to replace a defective part only required the warrantor to provide the "equivalent" of the part in terms of how long the part had been used. Hence, a "new" compressor would be the equivalent of a "new" compressor, at 43 n.3, and a "used" compressor need only be substituted for a "used" compressor, *id.* at 43. Under this reasoning, I assume in order to provide an "equivalent" for a defective part, that a three-year-old defective compressor must be replaced with a three-year-old defective compressor, or at least a three-year-old used compressor.

Still, I think the suggestion in the principal opinion that appellants "seek to extrapolate the phrase by inserting the words 'with new' so the challenged phrase would read, 'Airtemps obligation is limited solely to repairing or replacing [with new] parts . . .' " is just as untenable as it would be to suggest that respondent desires to insert the words "with rebuilt" just before the word "parts". Yet that is what the principal opinion does.

No one seeks to insert words into the challenged phrase. It is our duty to decide if the warranty provision means that Airtemp will, if it does not repair, replace the parts with the equivalent of those which were purchased and not something else, such as used or rebuilt parts.

In my opinion, the main difficulty with the principal opinion is that it treats the warranty obligation as if it were a policy of insurance whereby the insurance company agreed to pay a sum equivalent to the depreciated value of the object—to replace as is. If I negligently damage another's automobile, my legal obligation would be to pay damages equal to the difference between the before and after value, and I would not be required to provide the other party with a new car. I would simply be required to pay for the damage I caused but it could not exceed the depreciated (present) value of the car I damaged. That is what the principal opinion regards as the extent of Airtemp's obligation. But, in my example, I had no contractual (warranty) obligation to the other party. It is mixing apples and oranges to view the obligations of new product warranties and general law on damages as similar—they are not similar.

The warranty is not a gift from the seller. It is part of the purchase and is included in the purchase price. Advertisements of warranties are commonplace and are used to induce consumers to buy one product over another. As stated in *Adams v. Covenant Sec. Ins. Co., supra,* 465 S.W.2d at 34, "[C]ourts are more concerned with the meaning that would ordinarily be understood by the layman who bought and paid for the policy." And construing the warranty as an ordinary person would read it, I think it clear that the warranty to "replace" defective parts means to restore the equipment to its condition as represented when sold—new. It is not ambiguous; at least I do not believe any purchaser has any doubt about what it means. It means "new" when the product bought is new.

If a person were going to pay over $2,000 for a new air conditioning unit, he probably would do what the Kawins did—read the various warranties carefully and try to get the most favorable one. Once a decision, based in large part on the warranty given, had been made, he would expect to receive what had been guaranteed—a new, defect-free central air conditioner. If before the contract was signed, however, the salesper-

son said, "If your brand-new air conditioner goes bad, we only replace parts with rebuilt ones," I think it unlikely the person would spend $2,000 with the prospect of getting used parts should any part prove defective.

No one has had the temerity to argue that had the Kawins known that defective parts would be replaced by used parts, rather than new parts, they would have bought the equipment anyway. I suggest our common experiences in this respect would dictate that the purchase would not have been made. That is because a reasonable person buying expensive equipment would expect the replacement of parts under warranty would be with the type of parts originally purchased—new. That is the reasonable expectation from the face of the warranty and it should be given effect here.

The warranty to replace defective parts obviously relates to the character of the item sold. Its character is that it is *new*. The warranty is specifically directed to that aspect of the product. There seems to be an unspoken value judgment being made that a "rebuilt" part (by definition a used part) is just as good as a new (unused) part. That may be correct from time to time but it simply isn't what the warranty of a new product calls for. Surely a seller would be committing a deception if he sold a rebuilt (used) product as a new product. The customer may well accept a rebuilt part in lieu of a new part, but that should be the *customer's* decision where he is *entitled, under the warranty*, to have the defective part replaced by a part of the like and quality he purchased in the first place. I'm sure it will come as a surprise to the purchasing public and to business enterprises which buy new machinery and equipment to be told that a new product warranty calling for replacement of defective parts means the option is with the manufacturer or seller to place a used part into the new equipment instead of the type of replacement which returns the product to the state it was in *when purchased*—new.

Lip service seems to be given to the new product warranty in footnote 3 of the principal opinion wherein it is suggested that new parts might be required if the product fails very soon after purchase. Why the distinction? If a manufacturer can satisfy the *warranty* with used parts after a year or two, why not after just a month? The answer is there is no valid distinction when the obligation arises under a warranty such as we have here directed to a new product. The distinction attempted in the principal opinion leaves the legal requirement undertaken by a manufacturer's or seller's new product warranty to replace defective parts in limbo, to be decided on a case-by-case basis depending on *when* the defective part manifested itself. All this assumes, as is the fact in this case, that the warranty to replace defective parts was and is operative (not expired) at the time the defect was discovered, and whatever the obligation of the seller is, it *arises under the warranty* issued at the time of the purchase of the new product and not by reason of any other, if any there be, duty of the seller.

The warranty in the instant case conforms to the general wording of a "limited" warranty. That is to say, the seller's obligations and liabilities are limited to those set forth in the warranty. Cases dealing with the seller's obligations are usually suits for damages where the seller allegedly failed to live up to the warranty and illustrate the obligation undertaken by the warranty.

In *Chatlos Systems, Inc. v. National Cash Register Corp.*, 635 F.2d 1081 (3d Cir. 1980), the court stated the following:

This section requires analysis of the applicable remedy so as to determine its essential purpose and whether it has failed of that purpose. Several goals of the limited remedy of repair may be envisioned, but its primary objective is to give the seller an opportunity to make the goods conform while limiting exposure to risk by excluding liability for damages that might otherwise be due. *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del.1973). *Viewed from the buyer's standpoint, the repair remedy's aim is to provide goods that conform to the contract for sale* and do so at an appropriate

time. A delay in supplying the remedy can just as effectively deny the purchaser the product he expected as can the total inability to repair. In both instances the buyer loses the substantial benefit of his purchase.

*Id.* at 1085 (emphasis added).

And in *Delhomme Indus., Inc. v. Houston Beechcraft, Inc.*, 669 F.2d 1049 (5th Cir. 1982), the court held: "The test in determining whether a limited warranty failed of its essential purpose is whether the buyer is given, within a reasonable time, goods that *conform to the contract.*" *Id.* at 1063 (emphasis added).[2]

The question here really is whether supplying a rebuilt (used) part puts the air conditioner in conformance with the contract under which it was purchased. It seems clear that the air conditioner would not have conformed to the contract of purchase when purchased if it contained a used compressor because it was represented and sold as a new (unused) air conditioner. To conform the air conditioner to the purchase contract when a defective part is to be replaced simply means the part must conform to the contract and that contract called for a new air conditioner. Therefore, a *new* part is necessary for conformance.

It is my opinion that a layman (consumer) who buys and pays for a new air conditioner and its limited warranty would ordinarily understand that defective parts are to be replaced by what he bought—new parts. It is of no consequence that Airtemp has been replacing new parts with used parts in the past as a matter of unspoken policy. Surely a purchaser need not investigate the unstated policy of a seller prior to purchasing a new air conditioner. It certainly was not the burden of the appellants to prove the seller had, in the past, lived up to its warranty by doing what the warranty on its

face required—new parts for new parts. Nor, in my opinion, is it any defense for the respondent to show that it had an unstated policy of replacing new parts with used parts. That holding in the principal opinion simply allows a seller or manufacturer to avoid the ordinary meaning of the words used in a new purchase warranty by not conforming its practice to the plain meaning on the face of the warranty.

In my opinion, the Federal Trade Commission's Regulations, 16 C.F.R. §§ 26.2 and 26.12 (1968) were admissible, and the trial court erred in sustaining respondent's objection thereto. The appellants *bought* the warranty just as surely as appellants *bought* the air conditioner. Warranties *are* an *integral* part of the marketing of products, particularly new products. To say otherwise is to simply ignore the daily advertising on television, radio, and in the print media, and their impact on and importance to the potential purchasers and the sale of goods. The warranty here did cover defective parts and as such it "marketed" the replacement guarantee as part of the sale of the new product and warranted that if it failed the defective parts would be replaced so as to conform the equipment to the purchase contract.

The principal opinion states: "Plaintiffs have cited no authority (and we find none) which holds that the 'marketing' of a rebuilt product or part includes the fulfillment of the warranty terms long after the sale had been completed." at 45. The answer is that the warranty itself was marketed and, on its face, would lead an ordinary purchaser to conclude that the parts spoken of in the warranty would be new parts. If the respondent intended to use used parts in the purported fulfillment of the warranty, then that constituted a false, misleading, deceptive, or unfair trade prac-

---

**2.** The same observation was made in *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del. 1973), when the court said:

The purpose of an exclusive remedy of replacement or repair of defective parts, whose presence constitute a breach of an express warranty, is to *give the seller an opportunity to make the goods conforming* while limiting

the risks to which he is subject by excluding direct and consequential damages that might otherwise arise. From the *point of view of the buyer the purpose of the exclusive remedy is to give him goods that conform to the contract* within a reasonable time after a defective part is discovered.

*Id.* at 426 (emphasis added).

tice, because it was not disclosed at the time the new air conditioner with warranty was sold.

What is the difference between a new and a used (rebuilt) item? Everybody knows the difference—the *new* item has *not been used* by anyone. The used or rebuilt item has been used. Every purchaser knows the difference. What is a rebuilt item? In the first place, it isn't new; it is used. What are its quality characteristics— what's the standard or is there any for qualifying as a "rebuilt" item? There are no quality standards that I know of—to the contrary, they are whatever the party who repairs a used item says they are. The clear distinction known to all as between a "new" item and a "used (rebuilt)" item is reflected in the price tag and that is something that every consumer knows. I believe the principal opinion does an enormous disservice to the public by allowing the manufacturer or seller to substitute used parts for new parts in the seller's discretion based on unstated policy, which is clearly contrary to the new equipment warranty that the buyer purchases. By definition, the used part does *not* make the equipment purchased new conform to the new purchase contract. Therefore, the principal opinion permits a violation by the seller of one of the most important marketing commitments utilized by sellers in competitive merchandising of new products and deprives the buyer of the right to rely on the most important security he has when purchasing new equipment—the dealer's or manufacturer's warranty.

The appellants-purchasers in this case bought a new air conditioner and the warranty and paid over $2,000 for them. The equipment did not work due to a defective compressor. The respondent failed to repair it and refused to replace the defective compressor with the kind appellants bought—a new one—which I regard as required by the clear, unambiguous terms of the warranty, and as ordinarily understood by purchasers.

For the reasons stated, I respectfully dissent.